**DAD'S ROOT BEER CO. v. ATKIN et al.**

No. 9333.

United States District Court
E. D. Pennsylvania.
May 12, 1950.

Fred Wolf, Jr., Philadelphia, Pa., Moses Levitan, Chicago, Ill., for plaintiff.

Arthur E. Dennis, Mortin E. Rotman, Harry Langsam, Philadelphia, Pa., for defendants.

LeRoy Comanor, Philadelphia, Pa., for defendants and for James J. Connolly, trustee in bankruptcy.

CLARY, District Judge.

The plaintiff herein is an Illinois corporation and the defendants are residents of Pennsylvania and Minnesota jointly registered to do business under the Fictitious Name Act of the Commonwealth of Pennsylvania in the County of Philadelphia. 54 P.S. § 28.1. The sum in controversy exceeds $3,000.00, exclusive of interest and costs. The bases of the action are breach of contract, unfair competition, and violation of plaintiff's trade-marks. The case is therefore before us on both diversity of citizenship and under the Trade-mark Laws of the United States.

The case was tried to the Court without a jury. It involves over five hundred pages of testimony and eighty-five exhibits. Seventy-nine pertinent requests for findings of fact have been submitted, forty-seven by plaintiff and thirty-two by defendants. I have concluded that the findings of fact in this case will be more understandable if presented in narrative form and I shall, therefore, incorporate all findings which I deem material to a decision of the issues in the following discussion:

The plaintiff was organized in the year 1927 under the name of Chicago Distilled Water and Beverage Company. During its early history, while it engaged in the manufacture and sale of general carbonated beverages, it developed a formula for the manufacture of a concentrate from which root beer was manufactured and which was marketed under the name of "Dad's Old Fashioned Root Beer". The product had public appeal and root beer sales developed to such an extent that the company gradually withdrew from the manufacture of products other than root beer so that by 1941 it produced root beer exclusively. In May of 1941 the name of the corporation was changed to "Dad's Root Beer Company" and it has retained that name until this day.

During the year previous to its change of name, plaintiff adopted a new course of business wherein by use of franchise agreements it authorized bottlers in various parts of the United States to bottle and sell Dad's Old Fashioned Root Beer under that trade-name to be made only from the concentrate supplied by the plaintiff. After 1941 the only manufacture and sale of root beer conducted by the plaintiff itself was in the Chicago, Illinois, area and communities adjacent thereto. By use of the franchise agreements plaintiff secured nationwide distribution of its product and advertised extensively under trade-marks and trade-names of Dad's Old Fashioned and Dad's Root Beer. It developed and included in its label and trade-marks the names "Papa", "Mama", and "Junior" to designate respectively its half gallon, quart, and twelve ounce bottle size. It also arranged with its franchise distributors to bottle and sell the product in brown or amber bottles of a predetermined shape and size. In connection with its operations plaintiff did promotional work with the distributors and attempted to keep and maintain a uniform product among all its distributors by exam-

ining at intervals samples of distributors' products in its own laboratory facilities at its Chicago plant.

Mike Kraft, one of the defendants, began under franchise during 1941 the bottling of Dad's Old Fashioned Root Beer in the Philadelphia area. On or about May 17, 1945 plaintiff entered into a franchise agreement with the defendants Mike Kraft, Harry Atkin and Jack Ravine, who registered to do business in Pennsylvania, individually and as partners trading as Dad's Root Beer Bottling Company. This particular franchise covered the City of Philadelphia and the Counties of Bucks, Montgomery, Delaware, Chester and Philadelphia, in the Commonwealth of Pennsylvania. On July 10, 1945 an additional franchise appointed them as distributors for the City and County of Camden, and the Counties of Gloucester, Salem, Cumberland, Cape May, and Atlantic, in the State of New Jersey. On July 29, 1947 a further franchise encompassed the City of Trenton, and the Counties of Mercer, Hunterdon, Somerset, Burlington, Ocean, Monmouth and Middlesex in the State of New Jersey. On August 8, 1947 a further franchise was granted for the City of Wilmington, and the Counties of Newcastle, Kent and Sussex in the State of Delaware; and the Counties of Kent, Queen Ann's, Caroline, Talbot, Dorchester, Wicomico, Somerset and Worcester in the State of Maryland. With the approval of the plaintiff, defendants Mike Kraft, Harry Atkin and Jack Ravine added defendants Morris Atkin and Louis Atkin to the partnership conducted by them and which had been granted the various franchises above outlined. Each and every of these contracts incorporated the general franchise agreement drawn by the plaintiff for general use throughout the country in its operations. The franchise was by its terms a perpetual franchise and was cancellable on the part of the plaintiff for cause only. No provision for cancellation on the part of a distributor was incorporated into the contract. The agreement was silent, therefore, as to any requisite period of notice of cancellation.

From 1941 to 1948 Mike Kraft, and from 1945 the other defendants, used as a label for their product, with of course the consent and approbation of the plaintiff, registered trade-marks bearing No. 364823 and No. 399605, both of which had been properly registered in the office of The Commissioner of Patent and reissued under the Lanham Act, 15 U.S.C.A. § 1051 et seq. These trade-marks were likewise registered in Pennsylvania, Delaware and New Jersey in the years 1941, 1945 and 1946. In the period from October 15, 1941 to May 7, 1948, the defendants purchased from the plaintiff sufficient concentrate to produce over fifty-two million bottles of root beer in the twelve ounce size for distribution in the franchise areas.

The testimony in this case clearly indicates that the peak season for the soft drink business in the franchise areas runs from June 1 through October of each year. At the beginning of the peak season of 1947 the defendants ran into considerable difficulty in the manufacture of their product. Defendants manufactured soft drinks other than root beer. The chief difficulty was caused by a separation of the oils from the carbonated water which resulted in a rather bitter taste to some of the products, including root beer, manufactured by the defendants. As a result of the manufacturing trouble, plaintiff was forced to take back and replace thousands of cases of root beer. Plaintiff herein was notified of the difficulties and officers and agents of the plaintiff were called into consultation. At no time during this period did the defendants make any claim against the plaintiff that the trouble stemmed from bad concentrate. At frequent intervals during this period plaintiff pressed the defendants to submit samples of their products monthly in order to enable the plaintiff through its laboratory facilities to ascertain the cause of the trouble and to assist the defendants in obtaining a satisfactory uniform product by offering advice and suggestions. Documentary evidence conclusively proves that defendants failed to do so. The only testimony from which might be drawn an inference that the concentrate was a factor in the defendants' manufacturing troubles was the statement of a qualified food expert who examined two cans of plaintiff's con-

centrate and who testified to some difference between the two in odor and taste. Significantly, however, this expert failed to state that this slight difference in odor and taste would result in a product not fully acceptable and marketable. There is an entire lack of any evidence to justify a conclusion that the concentrate furnished by the plaintiff was the cause of defendants' difficulties. On the contrary, the testimony convinces me that the defendants during this period conducted their business in an unsanitary fashion and that this method of operation was the cause of the manufacturing difficulties encountered by them. One important factor is that on returned root beer, the defendants substituted other root beer, apparently made from the same batch of concentrate, which replacements were apparently satisfactory.

Partly as a result of its manufacturing difficulties (a lessened demand for the product also being a factor), defendants during the Fall of 1947 encountered financial difficulties. As part of its agreement with the defendants, the plaintiff sold and delivered to the defendants from time to time point of sale and other promotional and advertising merchandise. The cost of this advertising merchandise was charged to the defendants on the books of the plaintiff in a memorandum advertising account. A certain percentage of the cost of the concentrate purchased by the defendants from the plaintiff was credited against this account. In October of 1947 there existed a charge against the defendants of a sum in excess of $44,000.00 in the memorandum advertising account.

 Mike Kraft, representing all of the defendants, during the month of October, 1947, requested the plaintiff to cancel this charge so that he and his associates might obtain a loan from banking sources to carry on the business of the defendants. After negotiations, plaintiff agreed to the cancellation and wrote to the defendants that the entire advertising memorandum account charged against them would be cancelled as of December 31, 1947. A credit entry to that effect was actually made on the books of the plaintiff corporation so that as of January 1st, 1948 plaintiff's original book of account reflected no charge against the defendants for this item.

The evidence regarding the foregoing transaction is conflicting as to whether this was an outright or conditional cancellation. Two facts stand out in bold relief. First, the defendants needed to have the charge cancelled in order to secure working capital loans from banks. The plaintiff, on the other hand, needed a distributor for its product in the Philadelphia area. I am not so naive as to believe that plaintiff company cancelled this large charge without obtaining a quid pro quo, nor do I believe that the cancellation was conditional. The only hope that plaintiff had of obtaining its money was through continued operation of the defendants and future profits from that business. I find that it was within the contemplation of the parties and understood between them that the defendants would continue to bottle and distribute plaintiff's product for an indeterminate period of time and one certainly which required defendants, if they should wish to terminate the relationship, to give to the plaintiff reasonable notice of intention to terminate so as to permit plaintiff to obtain in their place and stead another distributor of like capacity and ability to represent it in the Philadelphia metropolitan area. There is no doubt that the replacement of defendants would require a considerable time. What is a reasonable time for notice of cancellation varies with the circumstances of each case. Under the circumstances of this particular case, keeping in mind the size of the operation, the amount of investment necessary, and the seasonal fluctuations in this business which has a peak season, as indicated before, running from June 1 through October, I find that a period of six to nine months would be a reasonable period of notice of cancellation. The greater period comes into play when the notice is given at the beginning of a peak season, as was done here.

After this agreement and until May of 1948, defendants continued to purchase concentrate in volume from the plaintiff and manufacture Dad's Old Fashioned Root Beer and distribute it in the franchise areas. While so doing, defendants without

notice to the plaintiff decided to discontinue representation of the plaintiff in the manufacture and distribution of its product and to that end obtained title to a fictitious name, "Pop's", which had been registered as such in 1946 under the appropriate act of the Commonwealth of Pennsylvania in Philadelphia. Thereafter, Mike Kraft, acting for all the defendants, made unreasonable demands on the plaintiff for advancement of monies by it to the defendants under threat of quitting and starting both a root beer and a franchise business in competition with the plaintiff. When these unreasonable demands were not acceded to, Kraft notified the plaintiff by telephone that he would no longer manufacture Dad's Old Fashioned Root Beer and that he would show plaintiff how to run a franchise business.

■ Defendants thereupon registered in the Commonwealth of Pennsylvania to do business under the trade-name "My Pop's Root Beer Company". They consulted patent counsel to determine whether the name "Pop's" would infringe upon the name "Dad's" and were advised that in the state of the industry the plaintiff had no exclusive right to a name designating a family connection in the manufacture of root beer. Counsel cited as names already in use "Ma's", "Ma's Old Fashion Root Beer", "Uncle Ben's Old Fashioned Root Beer", "Grandpa Graf's", "Big Pop", "Grand-Pop", "Poppy" and "Home Pop". Further, on advice of counsel, labels, coloring and other distinctive devices were adopted with the purpose of differentiating the markings of the new product as far as humanly possible so as not to come into conflict with color or other identifying marks of the plaintiff's. Defendants had previously made a very substantial investment in bottles and cases for the manufacture and distribution of plaintiff's product. It used these containers to bottle its new product. Plaintiff contends that it had exclusive right to use the amber or brown bottle for the distribution of root beer and further that the use of them by the defendants was calculated to confuse the general public. With this I do not agree. While plaintiff made every effort to standardize its bottles throughout the country, other beverage manufacturers including root beer manufacturers had made prior use of the same type and color of bottle. Defendants had a right to use their own bottles and, standing alone, I can see no objection to defendants using bottles in which they had made such a large investment and for which there was no other use.

Defendants commenced operations on or about June 18, 1948 and distributed the new product under the trade-mark which had been registered in the United States Patent Office and in the States of Pennsylvania, Delaware and New Jersey—"My Pop's", and adopted the slogan and label "My Pop's Its Tops In Root Beer". Plaintiff, after receiving word from many sources that the defendants were so operating, notified defendants on July 26, 1948 that their actions constituted a breach of contract, unfair trade practice and trade-mark infringement, and warned them to cease and desist. Notwithstanding this warning, defendants continued operations and their methods of operation closely paralleled plaintiff's. The retail outlets furnished with the new product were the same outlets and the same list of customers which the defendants had supplied with the plaintiff's product from 1941 through 1948 and which list had been built up through the joint efforts of plaintiff and defendants. At the time of the change-over from "Dad's" to "Pop's", outward appearances did not and were not calculated to disclose to the public a clean break in the relationship of the parties. The word "Dad's" was not eliminated from office doors and trucks until sometime after the defendants had started producing the new product. The word "Dad's" on the cases was painted over with a light cream color paint which permitted it to be readily identifiable under the paint. The trade-mark "My Pop's" and the slogan "Its Tops In Root Beer" were stenciled on the side of the cases and not on the ends as had been the name "Dad's".

Despite plaintiff's warning, defendants continued operations and this action was instituted asking four different and distinct types of relief: (a) damages for breach

of contract, for balance due on open merchandise account, and for the entire advertising account; (b) a permanent injunction against defendants, their servants, agents, employees, and attorneys, or any one acting through them, restraining them from the use of the name "My Pop's" in the manufacture and distribution of root beer in the franchise areas; (c) a similar injunction against unfair trade practices; (d) an accounting for profits. At the trial, the plaintiff asks additional relief by the inclusion of the Trustee in Bankruptcy in any injunction which might be granted; the defendants having been declared bankrupt in November of 1949.

In their answer defendants contend that the plaintiff breached its contract in furnishing them in May of 1947 with inferior concentrate which caused spoilage to over thirty thousand cases of root beer manufactured from the concentrate and which had to be replaced at a cost of over $44,000.00 to the defendants with resultant loss of business, good will, and damage to reputation. Defendants further contend that their cancellation of the contract was justified and for cause, that their actions thereafter were entirely legal, and that the use of the name "My Pop's" is not deceptively similar to plaintiff's trade-mark, is not likely to confuse the general public and, further, that the trade-mark registrations of the plaintiff are invalid.

█ I will discuss the requests as prayed for in the complaint. The first involved the allegation of breach of contract. Defendants interpose two defenses. First, that by furnishing bad concentrate plaintiff breached the contract. Secondly, that since the agreements are silent as to any period of notice of cancellation on the part of the defendants, the defendants had the right to cancel at will. Both of these defenses can be disposed of without difficulty. The first involves a question of fact. I have found that plaintiff did not furnish bad concentrate and the defense must therefore fall with that finding. While the second defense raises a question of law, in view of my finding that the advertising account was cancelled in return for defendant's promise to continue to bottle plaintiff's product, I am concerned not solely with a matter of law but a factual issue as well. Under the subsequent agreement defendants were obligated to continue bottling plaintiff's product and were obligated to give reasonable notice of intention to terminate.

█ There is no question that the balance due on the merchandise account amounts to $5095.39. The advertising account from the period January 1, 1948 to June 18, 1948 amounts to $3184.70. In addition to the book accounts, merchandise and advertising, stated above, plaintiff is entitled to damages for breach of contract. Based upon all the evidence in the case, taking into account one year's sales and the profits thereon and pro-rating them over a nine month period, I fix damages for breach of contract in the sum of $7500.00. Plaintiff has requested damages for loss of profits based on a gross profit of 40% on sales of approximately $44,000.00. I have considered all the testimony in reference to this claim and have concluded that plaintiff is entitled to damages for loss of profits based upon net rather than gross profits, and I have made my finding accordingly.

█ Both parties at the trial, in their arguments and in briefs have stressed the issue of trade-mark infringement and I have been asked to make a ruling upon the narrow and specific issue of trade-mark infringement. I am not prepared to state that the name "My Pop's" together with the slogan "Its Tops in Root Beer" is so similar to the name "Dad's" as to be likely to cause confusion even among the more careless of purchasers. I base this ruling upon the very prevalent practice in the industry of making use of names denoting the family relationship with respect to the preparation of root beer. This, no doubt, stems from the old practice of the home brew of root beer and pride in the secret family formula. While the name "Pop" has the same connotation as that of "Dad", namely, both being synonyms for "Father", I am not impressed that the similarity in connotation alone is a deciding factor. The similarity must be considered in its relationship to the appearance of the labels.

In this regard, there is no probability of confusion. Plaintiff's label has as its predominant colors, orange and blue, has the word "Dad's" in block letters running diagonally across the label and features a figure of a man on the label. Defendants' label, on the other hand, has white as the predominant color and has the letters "Pop's" in varied colors and set in unusual type. It has no picture on the label. Considering all these factors, I conclude that defendants' trade-mark is not so deceptively similar to plaintiff's as to be likely to cause confusion and, therefore, is not an infringement thereof.

■ A trade-mark is a symbol of good will and the law of trade-marks is but a part of the law of unfair competition. Seven Up v. Cheer Up Sales Co., 8 Cir., 148 F.2d 909. Anyone who attempts to "take a free ride" and profit by the good will built up by another is subject to equitable restriction. The attempt to "take a free ride" may be made by the use of a deceptively similar trade-mark, or it may be attempted in the much broader field of unfair competition. As I have indicated above, defendants are not guilty of trading on plaintiff's good will by use of a deceptively similar trade-mark, but I am convinced under all the facts in the case that defendants clearly attempted to take advantage of plaintiff's good will in the franchise areas and profit thereby to the detriment of the plaintiff.

■ Where a contractual relation between parties is terminated and one person is the licensee of the other and continues in the same business, the competition then arising tends to have a confusing effect upon the public. Ordinarily, considerable time must elapse in such case before the public becomes aware that those formerly affiliated are not in competition each with the other. For this reason, it is my opinion that a person terminating relations with his licensor owes a greater duty to distinguish and differentiate than does a complete stranger. I feel that such licensee is under a duty to make sincere efforts to make known the termination of the previous relationship with his licensor and avoid any possibility of confusion. In this case, defendants did not measure up to that degree of responsibility. Rather what they did was calculated to create the impression that there had been a change in name only but not in the product or methods of operation. In addition to doing many positive acts to create such an impression, the defendants by negative actions allowed the impression of the former association to continue among their customers. Even before the formal termination of contractual relations, defendants acquired title to the name "My Pop's" in an effort to come as close as possible to the name of their former licensor without being guilty of trade-mark infringement. With the help of patent counsel, they made sufficient changes in name and labels to make the two marks readily distinguishable by the general public and to that extent they were successful in their efforts. But, to the extent that defendants went beyond the mere use of a name denoting the same relationship as "Dad's" they were guilty of unfair competition and their use of the name "My Pop's" is important only as indicative of their intention to deal on the plaintiff's good will.

■ In light of the other factors present in the case, it is clear that everything defendants did was calculated to create and maintain the impression that they were still bottling the same product as they had formerly done under the name "Dad's". They laid their plans, by the acquisition of the name "Pop's", by acquiring a supply of labels and advertising paraphernalia before the termination of relations with plaintiff, in such a way that they were able to maintain a continuous operation and to provide a continuous supply of root beer to their retail dealers. They continued to deal with the same retail dealers with whom they had previously dealt as manufacturers and distributors of "Dad's". It must be borne in mind that this list of retail dealers had been built up through the joint efforts of both plaintiff and defendants. They operated from the same location and they had the same telephone listing as they had when they were franchisees of plaintiff. They allowed the name "Dad's" to remain on plant doors and on some of their

trucks for a considerable period of time after they were no longer associated with "Dad's". To retail dealers they wrote letters stating that they had changed their fictitious trade-name, but the letters were so worded that the dealers would get the impression that the same product was being bottled. Certainly there was nothing in the letters which clearly informed the customers that the defendants were no longer associated with "Dad's". Further, they permitted their distributors and employees to represent to the retailers that the product they were now bottling was the same as "Dad's". It is in the background of all these factors that we must appraise defendants' conduct. Viewing their conduct in this light, we cannot escape the conclusion that defendants are guilty of unfair competition and trade practices, Socony-Vacuum Oil Co., Inc., v. Rosen, 6 Cir., 108 F.2d 632.

In cases dealing with trade-mark infringement and unfair competition, each case must be decided on its own distinctive facts and except to the limited extent that facts might be completely analogous, precedent is of little value. Magitex Co., Inc., v. John Hudson Moore, Inc., 154 F.2d 177, 33 C.C.P.A., Patents, 956. I do not base my decision on the narrow ground of trade-mark infringement because I am of the opinion that if defendants had used a name so completely dissimilar from plaintiff's that there could not possibly be any basis of connection, I would still reach the result that defendants were guilty of unfair competition in conducting their business as they did. That they used a name with a similar connotation is only one more factor indicating their intention to trade on plaintiff's good will and makes the case easier of decision.

To the facts as I have found them in this case, I consider the language of Mr. Justice Pitney in International News Service v. Associated Press, 248 U.S. 215, 39 S.Ct. 68, 73, 63 L.Ed. 211, 2 A.L.R. 293, appropriate and applicable: "* * * the transaction speaks for itself and a court of equity ought not hesitate long in characterizing it as unfair competition in business."

There are a multitude of cases bearing on this branch of equity but the principles governing them are as simple as the fundamental rules of honesty and fair dealing. As was stated in Perlberg v. Smith, 70 N.J.Eq. 638, 62 A. 442, 444: "What conduct on the part of a defendant will be held to constitute unfair competition is the subject-matter of discussion in cases too numerous for useful citation, but the principle applied in each case is extremely simple. As Lord Chancellor Halsbury said in the House of Lords, in the case of Reddaway v. Banham [1896] A.C. 199, p. 204 ([25] Eng.Rul.Cas. p. 197); 'For myself I believe the principle of law may be very plainly stated; and that is that nobody has any right to represent his goods as the goods of somebody else.'"

The principle underlying unfair trade practice cases is that one manufacturer or vendor is palming off his merchandise as that of another, Singer Mfg. Co. v. June Mfg. Co., 163 U.S. 169, 16 S.Ct. 1002, 41 L.Ed. 118; Elgin National Watch Co. v. Illinois Watch-Case Co., 179 U.S. 665, 21 S.Ct. 270, 45 L.Ed. 365; Standard Paint Co. v. Trinidad Asphalt Mfg. Co., 220 U.S. 446, 31 S.Ct. 456, 55 L.Ed. 536; Kellogg Co. v. National Biscuit Co., 305 U. S. 111, 59 S.Ct. 109, 83 L.Ed. 73; or that he is vending the products of another as his own, International News Service v. Associated Press, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211, 2 A.L.R. 293. The record of this case clearly places the acts of defendants in the first category.

I, therefore, make the following conclusions of law:

### Conclusions of Law

1. The Court has jurisdiction of the parties and the subject matter, both under the diversity provisions of the Judicial Code and under the Trade-mark Laws of the United States.

2. Plaintiff is entitled to recover from defendants the sum of $8,280.09 on open accounts for merchandise and advertising, with interest from June 18, 1948.

3. Defendants are guilty of the breach of a valid and subsisting contract with

the plaintiff and are liable in damages for the breach thereof in the sum of Seventy-five Hundred ($7500.00) Dollars.

4. Defendants are not guilty of infringement upon plaintiff's trade-marks.

5. Plaintiff is not entitled to an injunction against the defendants for trade-mark infringement.

6. The defendants are guilty of competing unfairly with the plaintiff.

7. The plaintiff is entitled to an injunction restraining the defendants, their attorneys, agents, and any person or persons holding through or under the defendants, or through or under the Trustee in Bankruptcy of the defendants' bankrupt estate, restraining them and each of them from committing any acts constituting unfair competition with plaintiff's business or with plaintiff in the sale by plaintiff of its product under the name of "Dad's" in the franchise areas.

8. Neither the defendants nor the Trustee in Bankruptcy of the defendants' bankrupt estate are entitled to recover any sum whatsoever from the plaintiff upon the defendants' counterclaim.

9. No accounting for profits is awarded.