KAMPGROUNDS OF AMERICA,
INC., Plaintiff,

v.

NORTH DELAWARE A-OK CAMP-
GROUND, INC., Defendant.

Civ. A. No. 74–126.

United States District Court,
D. Delaware.

June 15, 1976.

Thomas S. Lodge, of Connolly, Bove & Lodge, Wilmington, Del., James H. Little-page, of Littlepage, Quaintance, Murphy & Dobyns, Washington, D. C., for plaintiff.

David A. Eastburn, Edmund J. Bodziak, Wilmington, Del., for defendant.

## OPINION

STAPLETON, District Judge:

This action seeks redress for alleged service mark infringement and unfair competition. In Count I, plaintiff Kampgrounds of America, Inc. ("Kampgrounds") alleges that defendant North Delaware A–OK Campgrounds, Inc. ("A–OK"), in using the mark A–OK along with the international campground symbol, has infringed two of plaintiff's registered marks: No. 781,522 for a tepee design with the letters KOA written underneath (hereinafter referred to as "KOA mark with logo") and No. 1,003,508 for the letters KOA alone (hereinafter referred to as "KOA mark"). Count II alleges that defendant competes unfairly with plaintiff by utilizing a mark which is a colorable imitation of plaintiff's KOA mark, thereby trading on the good will of plaintiff and subjecting plaintiff to loss of good will. Plaintiff asks for injunctive relief and damages pursuant to Section 35 of the Lanham Act.

Since 1963 plaintiff, a Montana corporation, has been an operator and franchisor of campground facilities throughout the United States.[1] Defendant, a Delaware corporation, operates a campground facility on Highway U.S. 40 near Glasgow, Delaware. From November 1, 1968 until October 30, 1973, defendant's predecessor in business, a partnership consisting of two brothers, Robert C. Justis and Cedrick D. Justis, d/b/a North Delaware KOA Campgrounds, operated a KOA campground on the Highway U.S. 40 site under a franchise agreement with plaintiff. On October 30, 1973, the franchise agreement expired and was not renewed. Defendant has continued operation of the same campground under the name "North Delaware A–OK Campground. (Admitted Facts, 3, 4 and 14 of the Pre-Trial Order).

Defendant does not contest plaintiff's ownership of the marks in question. Rather, defendant argues (1) that it is not engaged in interstate commerce and, therefore, is not subject to an enforcement action under the Lanham Act, (2) that in any case plaintiff's marks are not entitled to the protection of the Lanham Act because they are weak marks which have not acquired secondary meaning, and (3) that even if the marks were entitled to protection under the Lanham Act, defendant's mark A–OK is not likely to be confused with plaintiff's marks. I disagree with defendant on the first two points, but agree that there is no likelihood of confusion between plaintiff's and defendant's marks and that, therefore no infringement has been shown. Since plaintiff's claim for unfair competition is based on its allegation that defendant has used a confusingly similar mark to trade on plaintiff's good will, I also find that plaintiff has not met its burden of proof on Count II. Consequently, judgment will be entered in favor of defendant.

## I. SERVICE MARK INFRINGEMENT.

### A. *In Commerce.*

Defendant argues that it is not engaged in interstate commerce as required in an action under the Lanham Act, 15 U.S.C. §§ 1114, 1127,[2] since it performs all of its services on its campground which is located entirely in the State of Delaware. It is apparent to me, however, that defendant is engaged in interstate commerce. Defendant provides services to a transient population which customarily uses the nation's highways in interstate travel. (Admitted Fact 10, Tr. 208). Defendant advertises in three camping publications, with national

---

1. Plaintiff owns and/or operates 18 out of the 804 KOA campgrounds now in existence.

2. 15 U.S.C. § 1127 defines "commerce" as "all commerce which may lawfully be regulated by Congress."

circulation (Tr. 79, 80, 82, 110)[3] and has posted road signs on interstate highways apprising travelers of the locations of its facility. (Tr. 98, 179). Such activities constitute sufficient indicia of interstate business to fall within the "commerce" requirements of the Lanham Act. See *Application of Gastown, Inc.*, 326 F.2d 780, 51 CCPA 876 (1964); *Tiffany & Co. v. Boston Club, Inc.*, 231 F.Supp. 836 (D.Mass.1964).

Furthermore, it is well established that even if a business is totally intrastate in nature, if it impinges on the interstate use of a trade or service mark it falls within the meaning of "in commerce" as that term is used in the Lanham Act. *World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482 (5th Cir. 1971); *Tiffany & Co. v. Boston Club, Inc., supra.* See also *Ju-C Orange of America v. Kutztown Bottling Works*, 332 F.Supp. 962 (E.D.Pa.1971) and cases cited therein at 963. As stated in *Lyon v. Quality Courts United, Inc.*, 249 F.2d 790 at 795 (6th Cir. 1957):

> " '[T]he word "commerce" means all commerce which may lawfully be regulated by Congress.' 15. U.S.C.A. § 1127. Since as a matter of Constitutional law it is now beyond question that Congress may regulate intrastate activities which substantially affect interstate commerce. *Mandeville Island Farms v. American Crystal Sugar Co.*, 1948, 334 U.S. 219, 232–237, 68 S.Ct. 996, 92 L.Ed. 1328, it is clear that intrastate infringing use is within the provisions of the Act if it has a substantial economic effect upon interstate use by the mark's owner."

Here, there can be no question that *plaintiff* is engaged in interstate commerce. It is also undisputed that defendant's facilities and those of KOA franchisees in Delaware, nearby Maryland, New Jersey and Pennsylvania are competitive with each other. (Admitted Fact 9). Thus, if plaintiff were to establish that defendant's mark is likely to cause confusion among consumers as to the true origin of defendant's services, then defendant, to the extent it traded on plaintiff's good will and took business away from KOA franchisees would be interfering with plaintiff's interstate use of its marks. Defendant cannot succeed on a theory that its activities fall outside the scope of Lanham Act protections because it is not engaged in "commerce" as that term is defined in the Act.

B. *Strength Of Plaintiff's Mark And Secondary Meaning.*

Defendant next argues that even if it operates in "commerce" as that term is used in the Lanham Act, plaintiff's marks are not entitled to the protection of the Act since they are weak marks[4] and no secondary meaning has been established. Defendant contends that the name "Kampgrounds of America" is descriptive and, therefore, a weak mark and that since KOA simply represents these descriptive words it too is weak. I cannot agree with this analysis.

The mark "Kampgrounds of America" is not in issue in this suit. Plaintiff has never alleged infringement of this mark. If it were apparent, however, from the manner in which the KOA mark or the KOA mark and logo were displayed that KOA did indeed stand for Kampgrounds of America (for example, if the KOA mark always appeared alongside of the name Kampgrounds

3. *American Automobile Association Southeastern Directory, Rand McNally Campground and Trailer Park Guide*, and *Woodall's Directory to Trailering Parks and Campgrounds.*

4. As explained in *J. B. Williams Co., Inc. v. LeConte Cosmetics, Inc.*, 523 F.2d 187 at 192 (9th Cir. 1975), *cert. denied*, 424 U.S. 913, 96 S.Ct. 1110, 47 L.Ed.2d 317, 44 U.S.L.W. 3471 (1976):

> A 'strong' mark is one which is used only in a 'fictitious, arbitrary and fanciful manner', see *National Lead Co. v. Wolfe*, 223 F.2d 195, 199

(9th Cir. 1955), whereas a 'weak' mark is a mark that is a meaningful word in common usage, see *Sunbeam Lighting Co. v. Sunbeam Corp.*, 183 F.2d 969, 972–973 (9th Cir. 1950), or is merely a suggestive or descriptive trademark, see *Majestic Mfg. Co. v. Majestic Electric Appliance Co., Inc.*, 172 F.2d 862 (6th Cir. 1949). (footnote omitted).

See also *FS Services, Inc. v. Custom Farm Services, Inc.*, 471 F.2d 671 (7th Cir. 1972); *General Motors Corp. v. Cadillac Marine & Boat Co.*, 226 F.Supp. 716 (W.D.Mich., S.D. 1964).

of America), then I might be more convinced by defendant's arguments.[5] But this is a case where the KOA mark and KOA mark and logo are frequently displayed independently of the full name[6] and it is this display which plaintiff claims is infringed by defendant's use of A–OK.

 Therefore, examining the KOA mark and KOA mark and logo on this independent basis, it appears to me that these marks rather than being descriptive are more in the nature of arbitrary or fanciful combinations of letters and signs which constitute strong marks. Certainly KOA alone is not a "meaningful word in common usage";[7] nor does it describe the services being offered.[8] And the tepee logo, although it is representative of a commonly known object, would not ordinarily be associated in the minds of campground users with campground facilities.[9] In any case, the tepee design is always used in combination with the KOA mark and it is that combination which has allegedly been infringed. To determine whether a mark is descriptive, the mark must be examined as a whole unit. *Q–Tips, Inc. v. Johnson & Johnson,* 108 F.Supp. 845 (D.N.J.1952) *aff'd.* 206 F.2d 144 (3rd Cir. 1953), *cert. denied* 346 U.S. 867, 74 S.Ct. 106, 98 L.Ed. 377 (1953). Taken as a

whole, I believe the KOA mark and tepee logo are distinctive.[10]

Defendant's reliance on the *FS Services* case[11] is misplaced. The court there held that the letters FS denoting "Farm Services" or "Farm Supply", standing alone and without the red parallelogram for which plaintiff FS Services had become known, was a weak mark. Although the court did hold that the combination of letters FS alone was not "inherently distinctive or unique,"[12] it appeared to place equal, if not heavier, reliance on its determination that the abbreviation FS had itself become a descriptive or generic term representing the descriptive words farm service or farm supply. The court stated that "[a]bbreviations for generic terms *where they are generally recognized* must be treated [as weak marks]."[13] The court's holding stands essentially for the proposition that a descriptive mark, whether it is a word or an abbreviation, is a weak mark. Such is not the case before me. Defendants do not and cannot contend that the letters KOA are descriptive of the services provided by plaintiff.

 But even if plaintiff's marks were regarded as weak ones, I believe the record demonstrates that plaintiff, through exten-

---

5. See, for example, *Horlick's Malted Milk Co. v. Borden Co.,* 54 App.D.C. 91, 295 F. 232 (1924) where the court held that the fact that the letters "MM" appeared on the product label along with the words "malted milk" made it clear that "MM" stood for "malted milk" and was, therefore, descriptive. See also *Grove Laboratories v. Brewer & Co.,* 103 F.2d 175 (1st Cir. 1939).

6. See PX 8, 13, and parts of PX 4, DX, F, G. But see PX 9 and part of PX 4. Darrell R. Booth, plaintiff's Chairman and President, testified that the KOA mark and logo were the "focal point and the identification for the company throughout the United States and Canada and Mexico where it is used." (Tr. 15).

7. 523 F.2d at 192. The Court rejects defendant's contention that the fact that KOA is the name of a Hawaiian tree places that term in the public domain and, therefore, constitutes KOA a weak mark. Consumers of the services here in question are not likely to associate the term KOA with the name of a Hawaiian tree.

8. See 3 *Callman, Unfair Competition* (3rd Ed.) § 71.1 at p. 112:

 Designations are descriptive if they naturally and normally direct attention to the qualities, ingredients, appearance, effect, purpose, or other features of goods or services. (footnote omitted).

9. See 3 *Callman* § 71.1(e) for discussion of nondescriptive uses of descriptive words. Also see *Telechron v. Telicon Corp.,* 97 F.Supp. 131 at 150 (D.Del.1951), *aff'd.* 198 F.2d 903 (3rd Cir. 1952).

10. In the *Q–Tips* case the court found that the combination of the single letter Q with the common word Tips was an arbitrary symbol.

11. 471 F.2d 671 (7th Cir. 1972).

12. 471 F.2d at 674.

13. 471 F.2d at 674 (emphasis added).

sive promotional effort over the years, has established a secondary meaning to the KOA mark and the KOA mark and logo. In the often-quoted case of *G & C Merriam Co. v. Saalfield*, 198 F. 369 (6th Cir. 1912), the term secondary meaning has been explained in the following manner:

> It contemplates that a word or phrase originally, and in that sense primarily, incapable of exclusive appropriation with reference to an article on the market, because geographically or otherwise descriptive, might nevertheless have been used so long and so exclusively by one producer with reference to his article that, in that trade and to that branch of the purchasing public, the word or phrase had come to mean that the article was his product; in other words, had come to be, to them, his trademark.

198 F. 369 at 373.[14] The significance of secondary meaning is not that the consumers know the identity of the provider of services, but rather that they regard all services labeled with the mark as originating from a single source. *Union Carbide Corporation v. EVEREADY, Inc.*, 531 F.2d 366 (7th Cir., No. 75–1371, 1976). From the evidence before me I must conclude that consumers of campground services have come to regard the KOA mark and KOA mark and logo as hallmarks of a single supplier.

Plaintiff incorporated in 1963, with the first franchise becoming operational in 1964 (Tr. 14). There are now 804 campgrounds (Tr. 14), with more KOA campsites than the United States Park Service and the National Forest Service together provide. (Tr. 35). Plaintiff has used the KOA mark and logo as an integral part of its promotional effort since its inception. (Tr. 37–38). It has spent millions of dollars advertising its facilities, using the KOA mark and logo as the principal identifying symbol.[15] The mark has appeared millions of times on billboards, in camping directories, in material printed by the KOA franchisees, in magazines and journals and on television. (Tr. 16–17). In short, plaintiff has invested such time, money and energy in identifying its services with the marks in question that it would be difficult to conclude that those marks today indicate anything other than that the campground services so identified originate from a single source.[16] Thus, even if the marks initially were weak ones, they have now taken on the kind of distinctiveness which would warrant their protection under the Lanham Act. If there were a likelihood of confusion between defendant's and plaintiff's marks, plaintiff would

14. See also *Union Carbide Corporation v. EVEREADY, Inc.*, 531 F.2d 366 (7th Cir. No. 75–1371, 1976); *FS Services, Inc. v. Custom Farm Services, supra; National Automobile Club v. National Auto Club, Inc.*, 365 F.Supp. 879 (S.D. N.Y.1973) *aff'd.* 502 F.2d 1162 (2nd Cir. 1974); *General Motors Corp. v. Cadillac Marine & Boat Co., supra.*

15. The record does not reflect the exact dollar amounts spent on advertising *per se.* Mr. Booth testified that total promotional expenditures, which include expenditures on advertising, publication of the KOA handbook (which bears the KOA mark and KOA mark and logo), attendance at company shows, and promotion of camping generally, were $1,400,000 in 1974 and $1,800,000 in 1975 and that these figures were approximately matched by the franchisees who did their own advertising and promotional work using the service marks in question (Tr. 36).

16. Plaintiff did not introduce any consumer opinion evidence to substantiate that campground users do in fact regard the marks in question as indicative of a single supplier of campground facilities. The only evidence in the record in that respect is the testimony of one of defendant's own witnesses to the effect that he and his family identified KOA facilities by the marks in question (Tr. 174). I do not regard this gap in the record as determinative. What the Seventh Circuit Court of Appeals said with respect to the EVEREADY mark is equally applicable here:

> Additionally, we find it difficult to believe that anyone living in our society, which has daily familiarity with hundreds of battery-operated products, can be other than thoroughly acquainted with the EVEREADY mark. While perhaps not many know that Carbide is the manufacturer of EVEREADY products, few would have any doubt that the term was being utilized other than to indicate the single, though anonymous, source. A court should not play the ostrich with regard to such general public knowledge.

*Union Carbide Corp. v. EVEREADY, Inc., supra* at 381.

be entitled to relief. However, I am unable to find such likelihood of confusion.

### C. *Likelihood of Confusion.*

 Factors to be considered in determining whether there is a likelihood of confusion between the marks in question include the similarity between the marks in appearance, sound or suggestiveness, the comparative markets for the services which the marks identify, any evidence of actual confusion among consumers, and the alleged infringer's intent. *Union Carbide Corp. v. EVEREADY, Inc., supra; J. B. Williams Co., Inc. v. LeConte Cosmetics, Inc., supra; National Automobile Club v. National Auto Club, Inc., supra.* While each of these factors is pertinent to the determination of likelihood of confusion, none is controlling. *National Automobile Club, Inc. v. National Auto Club, Inc., supra.*[17]

 The Court must examine each mark as a whole as it would appear to the ordinary purchasers of the services in question. *Dresser Industries, Inc. v. Heraeus Engelhard Vacuum, Inc.,* 395 F.2d 457 (3rd Cir. 1968), *cert. denied* 393 U.S. 934, 89 S.Ct. 293, 21 L.Ed.2d 270 (1968). That class of purchasers in the instant case consists of the experienced as well as inexperienced users of transient campground facilities.[18]

(Tr. 209). The question then is whether the camping public "which includes the ignorant, the unthinking and the credulous, who, in making purchases, do not stop to analyze but are governed by appearances and general impressions"[19] would be confused by the similarity between plaintiff's and defendant's marks.

Plaintiff's marks consist of the letters KOA and the letters KOA written beneath a logo of a tepee as shown in Appendix A. The allegedly infringing mark consists of the letters A–OK written beneath a logo which is the international campground symbol adopted by the National Park Service. (See Appendix B).

When written, KOA and A–OK are clearly distinguishable, as are the tepee design and the international camping symbol. When the letters are combined with their respective designs the resultant marks remain easily distinguishable visually. This is particularly true in light of the fact that defendant's mark uses the international campground symbol which is meaningful to the ordinary person seeking camping accommodations. Thus, the suggestiveness of defendant's symbol helps to distinguish it from the design used by plaintiff in connection with the letters KOA. Likewise, although KOA and A–OK are similar in sound, the fact that A–OK carries with it a distinctive meaning[20] separates it in the

---

17. See also *A. Smith Bowman Distillery, Inc. v. Schenley Distillers, Inc.,* 198 F.Supp. 822 (D.Del.1961) (mere attempt to register similar mark not sufficient to show likelihood of confusion).

18. I find no merit to defendant's argument that since plaintiff's business consists primarily of franchising rather than operating campgrounds, the actual consumers of plaintiff's services are the potential franchisees, who themselves must be regarded as more knowledgeable and discriminating a class of consumers than the average campers. Plaintiff's two sources of revenues are royalties from its franchisees and profits from operating its own campgrounds. (Tr. 40). In both cases its income depends on the amount of camping services consumed by the public, and to that end plaintiff has expended significant time, money and energy to apprise the public of the availability of services provided by the KOA organization. The real targets of this promotional effort, of which plaintiff's marks are an integral

part, are the consuming public, not potential franchisees.

19. *Dresser Industries, Inc. v. Heraeus Engelhard Vacuum, Inc., supra* at 462.

20. *Webster's New World Dictionary of the American Language* defines A–OK in the following manner: "excellent, fine, in working order, etc.: a generalized term of commendation." At trial defendant introduced an excerpt from a National Aeronautics and Space Administration publication which attributed the origins of the term A–OK to the Mercury space project:

. . . The origin of the popular space term "A.OK" is a matter of widespread public interest. In reporting the Freedom 7 flight, the press attributed the term to Astronaut Shepard, and indeed NASA News Release 1–61–99, May 5, 1961, has Shepard report "A.OK" shortly after impact. A replay of the flight voice communications tape

ordinary listener's ear from the letters KOA, which in and of themselves suggest no commonly understood term.

 Plaintiff and defendant do provide virtually identical services and thus "the degree of similarity in the marks necessary to support a finding of infringement is less than in the case of dissimilar, non-competing products." *A. Smith Bowman Distillery, Inc. v. Schenley Distillers, Inc.,* supra at 826. But I conclude that the ordinary camper seeking a campground facility and noticing defendant's A–OK sign with the international campground symbol on it would not be induced by any similarity of that mark to the KOA mark to stay at defendant's ground thinking it was part of the KOA chain.

Nor is there persuasive evidence in this record that there has been actual customer confusion attributable to defendant's use of the name A–OK in conjunction with the international campground symbol.

The evidence plaintiff offered of actual confusion consisted of registration slips from defendant's records. During the two years immediately following the termination of defendant's license,[21] there were approximately 19,000 slips signed by campers at defendant's campgrounds. These slips contained a blank in which the registrants were asked to indicate what prompted them to stay at defendant's facility. Some 3,400 customers provided a legible response. Seventy-five of these, or less than .4% of the total number of registrants at defend-

ant's facility during the two year period in question, were introduced at trial as evidencing actual confusion.

Over half of the 75 responses (42) said "KOA guidebook" or referred to commercial camping directories either generally or by name. Twenty-one merely said "KOA". Three said "Thought it was KOA". The remaining 9 made some reference to the customers' prior experience with, or approval of, KOA campgrounds.

In evaluating this evidence, it is important to distinguish between business generated by defendant's use of its new, allegedly similar mark and business generated as a result of the past affiliation between plaintiff and defendant. It is the alleged similarity of the marks which is relevant to plaintiff's service mark infringement claim. Confusion resulting from the past affiliation between plaintiff and defendant and defendant's responsibilities to mitigate such confusion are relevant not to plaintiff's infringement claim, but rather to its unfair competition claim.[22]

I do not doubt that the 75 slips offered by plaintiff evidence confusion on the part of defendant's customers as to whether the facility was in fact part of the KOA organization. These slips do not establish, however, that the source of that confusion was defendant's use of a deceptively similar mark.

During the five years that defendant was a KOA licensee, thousands of guidebooks were distributed by defendant and other

disclosed that Shepard himself did not use the term. It was Col. John A. "Shorty" Powers who reported Shepard's condition as "A.OK" in a description of the flight. Tecwyn Roberts of STG and Capt. Henry E. Clements of the Air Force had used "A.OK" frequently in reports written more than four months before the Shepard flight. Roberts attributed coinage of the term to Paul Lein, of the Western Electric Co., while the tracking network was being constructed. Lein, however, said that "A.OK" was a communal development among communications engineers while circuits were first being established down-range from Cape Canaveral. The voice circuits at first gave poor quality. The bands were narrow, and the systems operated on 1500 cycles. There was much

static and background noise. Words got lost in voice circuit systems checks. To make transmissions clearer, the communicators started using "A.OK" because the letter "A" has a brilliant sound. Other sources claim that oldtime railroad telegraphers used "A–OK" as one of several terms to report the status of their equipment. Be that as it may, Powers, "the voice of Mercury Control," by his public use of "A.OK", made those three letters a universal symbol meaning "in perfect working order." Swenson, Grinwood, Alexander, *This New Ocean: A History of Project Mercury,* p. 575.

**21.** November 1973 through November 1975.

**22.** See *infra* at p. 1297.

KOA licensees. In addition, other independently published campground directories carried listings and advertisements of defendant's campground which prominently featured the KOA service mark. While these guidebooks and directories are published annually, they remain in circulation for a number of years. Obviously campers who possessed directories for these five years might well come to defendant's campgrounds for the night because they believed it to be a KOA facility. Similarly, many of the thousands of campers who visited defendant's campground during the five year period it was affiliated with KOA undoubtedly returned during the first two years of defendant's operation as an independent campground believing that it was still affiliated with KOA.[23] This suggests that the confusion exhibited by the 75 registration slips could well have resulted from defendant's past business affiliation with plaintiff rather than from an alleged confusing similarity of the marks.

The record supports such a conclusion. The incidence of slips referring to KOA dropped dramatically in the second year after termination of the license. Of the 75 slips introduced, 50 were from defendant's first year of operation, 23 were from its second year, and 2 were undated. The more than 50% drop during the second year in the number of slips making reference to KOA suggests that the confusion was dissipating as more and more old directories left circulation and as more and more of defendant's customers had occasion to return to its facility and were exposed to its A–OK signs. Perhaps more importantly, defendant introduced evidence that a campground in Gettysburg, Pennsylvania with no previous KOA affiliation, has operated for over five years under the name A–OK Campground and has encountered no customer confusion despite the presence of a KOA campground in the vicinity.

In light of the minute proportion of defendant's customers demonstrating any confusion at all and in view of the substantial question concerning the source of whatever confusion did exist, I cannot find on the record before me that the registration slips are persuasive evidence of actual customer confusion caused by the alleged similarity of plaintiff's and defendant's marks.

■ The final factor to be considered is defendant's motive in selecting the A–OK mark. If its president, Cedrick Justis, made his selection with the intention of usurping plaintiff's good will, this fact alone would constitute strong evidence that the selected mark holds the potential of confusion. I find, however, that Mr. Justis was not motivated by a desire to trade on plaintiff's good will.

In mid-1973, Justis decided not to renew defendant's KOA franchise because the franchise fee had gone from 5% to 8% and because he felt plaintiff's inspectors had become prone to "nit picking". Recognizing the need for a nationally recognized affiliation, he contracted with the American Automobile Association. Attempting to capitalize on the good will of that organization as well as the space age popularity of the term A–OK, he wrote to AAA and requested permission to call his campground "Triple A–OK" or "AAA–OK". On August 17, 1973, the AAA replied that while defendant was entitled to use the AAA logo on any signs and advertising, it could not incorporate the triple A concept in its name. As a result, defendant settled for "A–OK" used in conjunction with AAA insignia.

■ In the fall of 1973 defendant spent over $1,500 to remove from its campground all evidence of its former KOA affiliation. The highway signs as well as those around the camp were repainted. In addition to the change in name and symbol, the style of the lettering and the colors of the signs were changed. Buildings were repainted to avoid use of KOA's standard black and red colors.[24] Finally, Justis gave all of his old

---

**23.** Plaintiff and defendant must have anticipated when they executed their five year license that there would be a carryover of this kind, and obviously did not contemplate that it would give rise to liability.

**24.** While an otherwise infringing mark cannot be saved by altering the colors from those customarily used by the infringed mark's owner, 3 *Callman* § 82.1(j), it is clear to me that Mr. Justis believed such an alteration would help

KOA guides, registration slips, emblems, and literature to the nearest KOA franchise.

Plaintiff relies heavily on the fact that of the three directories defendant advertised in as both a KOA franchisee and then as A–OK, one advertisement in the year following the transition continued to represent defendant as a KOA campground on an adjacent map of the area. (Tr. 79–82). The evidence persuades me, however, that Mr. Justis wrote all three publishers requesting that they change his advertisement, that one did change the advertisement as requested, that one told him it was too late to make the requested change, and that the last changed the name but neglected to change the mark on the map. (Tr. 79–82).

I believe Mr. Justis made a good faith effort to have the advertisements in question changed to reflect defendant's new status, and that, at the worst, he is guilty of some negligence in not being more thorough in his request to the publisher of the one directory which left the KOA mark on the map. In all, he attempted to do everything he thought was necessary to advise his clientele of defendant's change of status and to avoid confusion.

In summary, I find no persuasive evidence of actual confusion or of nefarious intent on defendant's part. While plaintiff and defendant compete in the same market, a comparison of their respective names and symbols has convinced me that defendant's use of the name A–OK and the international campground symbol creates no likelihood of confusion in the market place. Accordingly, plaintiff's claim for trademark infringement must be denied.

## II. UNFAIR COMPETITION

 The Court's conclusions with respect to plaintiff's trademark infringement claim also dispose of plaintiff's unfair competition claim. It is true, as plaintiff urges, that the law of unfair competition imposes a duty upon a licensee to take reasonable

distinguish his campground facility from those of the KOA organization. It is, therefore, pro-

steps to avoid trading on his licensor's good will after the license term and that a licensee may breach this duty even though he avoids use of a deceptively similar name. See e. g., *Dad's Root Beer Co. v. Atkin*, 90 F.Supp. 477 (E.D.Pa.1950); 3 *Callman, Unfair Competition* (3rd Ed.) § 82.2(b)(3). Liability in such cases, however, is predicated upon evidence of a manner of doing business which is calculated to obscure the licensee's change of status. In this case, I find no such unfair practice by defendant.

Judgment will be entered for the defendant.

Submit order.

### APPENDIX A

KOA

### APPENDIX B

bative on the question of Justis' intent to trade on plaintiff's good will.