Leo R. FOUNTILA, Jr., et al.,
Plaintiffs-Appellees,

v.

Mary E. CARTER, Defendant-Appellant.

No. 75–2685.

United States Court of Appeals,
Ninth Circuit.

March 6, 1978.

Franklin J. Flocks (argued), Redwood City, Cal., for defendant-appellant.

James A. Thompson (argued), of Thompson & Wentholt, Redwood City, Cal., for plaintiffs-appellees.

Before DUNIWAY and KENNEDY, Circuit Judges, and PALMIERI *, District Judge.

PALMIERI, District Judge:

This is an appeal from a judgment and certain orders after judgment in a housing discrimination action brought, *inter alia,* under Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3601 *et seq.,* also known as the Fair Housing Act, and under the Civil Rights Act of 1866, 42 U.S.C. § 1982. The case was tried to a jury at defendant's request which, after a three-day trial, returned a verdict in favor of the plaintiffs, awarding them actual damages in the amount of $1 and punitive damages in the amount of $5,000. Additionally, the court awarded attorneys' fees to the plaintiffs in the amount of $2140.[1] Defendant's motions for a new trial and judgment notwithstanding the verdict were denied after oral argument.

## I.

### The Factual Background

Mrs. Carter, the defendant below, was a woman almost 72 years old at the time of trial in 1975. She owned a single-family house at 715 Lincoln Avenue in Redwood City, California which she and her husband had built and occupied with their family until approximately 1950. Subsequent to that time the house, which she acquired pursuant to a divorce in 1959, was used for rental purposes and Mrs. Carter rented a smaller dwelling for her own occupancy. Shortly before trial Mrs. Carter sold the house on Lincoln Avenue for about $59,000 and purchased another house with the proceeds.

The plaintiffs, Leo and Thelma Fountila and their three children, are a black family who wished to move from their home in Redwood City and were interested in renting the house at 715 Lincoln Avenue. Mr. Fountila was a veteran of the Viet Nam war and a student at the Bay Valley Technical School of Electronics; his wife was employed at Stanford University.

The complaint charged Mrs. Carter with unlawfully refusing to rent to the plaintiffs on account of their race. This claim was supported by evidence presented at trial which we shall now review.

---

* The Honorable EDMUND L. PALMIERI, Senior United States District Judge, Southern District of New York, sitting be designation.

1. This is the figure stated in the district court's order of June 2, 1975. However, in a hearing on May 30, 1975, an excerpt from the transcript of which is quoted *infra* at page 495, the court stated the amount awarded to be $2940, apparently the correct figure, which is arrived at by multiplying the hours alleged by counsel for the plaintiffs in their "declaration in support of request for attorneys' fees" by the hourly rates approved by the court.

In April of 1974 the house on Lincoln Avenue was about to become available for rent and was listed by Mrs. Carter with a rental agency known as "Rent-A-Home". On Friday, April 12, Mr. Fountila, having obtained Mrs. Carter's telephone number from the agency, called to inquire about the house. Upon being told that it was still available he proceeded to tell Mrs. Carter his "whole life history". Mrs. Carter indicated that she felt that Mr. Fountila's family would make acceptable tenants and arranged to meet with them at the house the following day. Near the end of their lengthy conversation Mr. Fountila inquired whether it would make any difference that they were black. Mrs. Carter testified that she was surprised to learn that the Fountila's were "colored", said "oh", and hung up the phone.[2]

Mr. Fountila subsequently conferred with a Mrs. Owens at the "Mid-Peninsula Citizens for Fair Housing", a voluntary organization which investigated complaints of housing discrimination. Mrs. Owens put Mr. Fountila in touch with Sharon Wagner, a law student who agreed to act as a "checker". Discrimination complaints were "checked" by sending a nonminority person, matched as closely as possible with the complainant for age, skills, and educational background, to determine whether discrimination had occurred. Ms. Wagner arranged with the Fountilas to visit Mrs. Carter's house together the next morning.

On the following day, Saturday, April 13, 1974, having earlier ascertained from Mrs. Carter by telephone that the house on Lincoln Avenue remained available for rent and that she could see it in the morning, Ms. Wagner went to the house and introduced herself to the defendant. She testified that Mrs. Carter told her something to the effect that a lot of people were interested in the house and that she would have a difficult decision to make and that she observed a number of people looking around the premises, some of whom were shown

the house by Mrs. Carter. Mr. and Mrs. Fountila arrived shortly thereafter, introduced themselves to the defendant, and were told that the house had already been rented.

The defendant did not seriously dispute at trial that the above events had occurred as stated. Rather, her primary argument was that the house had already been rented to one Ms. Woodsford prior to the time that she was called by Mr. Fountila, although she was not aware of this fact until so notified by her agent, Mr. McGinnis, on the morning of April 13.

Ms. Woodsford did in fact rent the defendant's house, under circumstances more fully described below, moving in on April 15. Mrs. Carter testified that she nonetheless continued that day to show the house to interested parties out of pride for her house and deference to their interest.

## II.

### The Issue of Liability

Appellant first argues that the District Court erred in denying her motions for a directed verdict and for judgment notwithstanding the verdict. These were made on the alleged ground that the evidence conclusively demonstrated that the house in question had been rented as a matter of law prior to plaintiffs' first contact with Mrs. Carter.

While we accept *arguendo* appellant's premise that a person cannot discriminate with respect to the rental of property that has already been irrevocably committed to another, we cannot agree that reasonable minds could reach no other conclusion on the facts of this case.

The standards for granting a judgment notwithstanding the verdict and for a directed verdict are the same. *Cockrum v. Whitney*, 479 F.2d 84, 85 (9th Cir. 1973); 5A Moore's Federal Practice ¶ 50.07[2]. Neither should be granted unless "the evidence permits only one reasonable conclusion as to

---

**2.** Mr. Fountila testified at trial that Mrs. Carter's remark at this point was, more completely, "oh, no, I can't rent to black people."

the verdict." *Kay v. Cessna Aircraft Co.*, 548 F.2d 1370, 1372 (9th Cir. 1977). In ruling on these motions

> the trial judge cannot reweigh the evidence or consider the credibility of the witnesses. The evidence must be viewed in the light most favorable to the party against whom the judgment would be granted and all inferences must be drawn in that party's favor. *Id.*

The United States Supreme Court stated these guiding principles well in *Tennant v. Peoria & P. U. Ry. Co.*, 321 U.S. 29, 35, 64 S.Ct. 409, 412, 88 L.Ed. 520 (1944):

> The focal point of judicial review is the reasonableness of the particular inference or conclusion drawn by the jury. It is the jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts. The very essence of its function is to select from among conflicting inferences and conclusions that which it considers most reasonable. . .
> Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable. [citations omitted]

■ Appellant states that "as a matter of simple agency law" Ms. Woodsford had a "specifically enforceable contract to rent the subject premises" on April 11, 1974, one day prior to the plaintiffs' first contact with Mrs. Carter, which occurred on April 12. Even though Mrs. Carter continued to show the property and tell people that it remained available after April 11, and, indeed, appears to have been under the impression herself until April 13 that the property had not yet been rented, it is argued that certain transactions between her agent, Mr. McGinnis, and the new tenant, Ms. Woodsford, contractually bound Mrs. Carter on April 11. Several witnesses for the defendant testified as to the following events:

1. Ms. Woodsford, having been informed of the availability of the property by an acquaintance at "Rent-A-Home", initially communicated with Mrs. Carter on April 8, 1974, and was told to get in touch with Mrs. Carter's real estate agent, Mr. McGinnis.

2. On April 10 Mrs. Carter met Ms. Woodsford briefly. Ms. Woodsford later that day paid a deposit to Mr. McGinnis.

3. On the afternoon of April 11 Mr. McGinnis came into the restaurant where Ms. Woodsford worked, bringing with him a document entitled "LEASE RENTAL AGREEMENT AND DEPOSIT RECEIPT". The front of the lease, which was an exhibit at trial and part of the record on this appeal, contains a recital that "in the event this agreement is not accepted by the owner or his authorized agent within four (4) days, the total deposit shall be refunded." Mrs. Carter had initialled the front page of the lease at the top and signed at the bottom. Above her signature, she had written in the words, "subject to meeting the new tenant." The back of the lease contains the words, "The undersigned owner accepts the foregoing offer and agrees to rent the herein described premises on the terms and conditions herein specified," followed by signature lines for the "owner's authorized agent" and the "owner". Mrs. Carter had not yet signed the back of the lease at the time of this meeting.

4. In the restaurant, Ms. Woodsford signed the lease, both on the front and on the back. Mr. McGinnis also signed on the front and on the back under the "acceptance" section.

5. Mrs. Carter later signed the back of the lease, the date and time of which are uncertain.

Appellant urges that, while Mr. McGinnis may not have been expressly authorized to enter into a binding contract with Ms. Woodsford on Mrs. Carter's behalf, nonetheless he had been invested with the *power* so to act, and that the contract he signed was binding as within the scope of his apparent authority. Since the document re-

quired only a single signature for acceptance, it is argued, Mrs. Carter's signature was superfluous. Appellant notes that "no jury could be expected to appreciate [these] subtleties of agency law." Finally, she submits that the words, "subject to meeting the new tenant," should be construed as a "condition subsequent", rather than precedent to the formation of a contract.

It is clear that the jury, even on the evidence described above, could have drawn reasonable inferences which would have defeated appellant's apparent agency theory. Among the controverted issues of fact which the jury was entitled to resolve unfavorably to the appellant was the effect of the phrase "subject to meeting the new tenant" upon the "appearance" of Mr. McGinnis' agency. The jury could reasonably have concluded that Mrs. Carter retained the right of refusal after April 11, and that her acceptance was not finally given until sometime on or after April 13, which was subsequent to her discriminatory refusal to accept the Fountilas as tenants. Moreover, as the sole judge of credibility, the jury could reasonably have chosen to disregard certain testimony essential to appellant's case.

Our conclusion, then, is that reasonable minds could in fact differ as to the date at which Mrs. Carter's house was rented, and, therefore, that the motions for a directed verdict and a judgment notwithstanding the verdict were properly denied by the district court. It should be noted in this context that to the extent appellant bases her dissatisfaction with the verdict upon the failure of the district court to instruct the jury on the law of agency, her assignment of error is precluded by her counsel's failure to request such instructions or object to their omission. Fed.R.Civ.P. 51.

### III.

#### The Issue of Damages

The propriety of the substantial punitive damages awarded by the jury lies at the heart of this appeal. In her motion for a new trial, which was denied, the defendant contended, inter alia, that the verdict was excessive and "appears to have been given under the influence of passion and prejudice and a misunderstanding of the law," that the jury was confused about the legal requirements of an award of punitive damages, not having been adequately instructed on the issue, and that in any case the evidence, considered in the light most favorable to the plaintiffs, was insufficient to support an award of punitive damages.

As a preliminary matter, we are satisfied that the issue of punitive damages was properly submitted to the jury. Punitive damages are not generally favored in the law and should only be allowed with caution and within narrow limits. However,

[t]he allowance of such damages inherently involves an evaluation of the nature of the conduct in question, the wisdom of some form of pecuniary punishment, and the advisability of a deterrent. Therefore, the infliction of such damages, and the amount thereof when inflicted, are of necessity within the discretion of the trier of the fact. *Lee v. Southern Home Sites Corporation,* 429 F.2d 290, 294 (5th Cir. 1970).

While our review of the record has not disclosed any evidence of a pattern or longstanding practice of racial discrimination on the part of Mrs. Carter, such factors are not essential to establishing an entitlement to punitive damages upon proof of a violation of the anti-discrimination laws. It is recognized that these laws "prohibit all forms of discrimination, sophisticated as well as simple-minded", and that disparity of treatment between whites and blacks "must receive short shrift from the courts." *Williams v. Matthews Company,* 499 F.2d 819, 826 (8th Cir.), *cert. denied,* 419 U.S. 1021, 1027, 95 S.Ct. 495, 507, 42 L.Ed.2d 294, 302 (1974). Under general principles actual malice is not required in order to support an award of punitive damages, but rather, "the defendant must act with such conscious and deliberate disregard of the consequences of his actions to others that his conduct is wanton." *Knippen v. Ford Motor Co.,* 178 U.S.App.D.C. 227, 236, 546 F.2d

993, 1002 (1976). This court has noted that a showing of personal animosity or involvement between the parties is not a prerequisite to instructing the jury as to punitive damages. *Gill v. Manuel*, 488 F.2d 799, 801 (9th Cir. 1973).

We think the evidence adduced at trial was sufficient to warrant a jury finding that some award of punitive damages was appropriate under the circumstances of this case. Mrs. Carter admitted that she hung up on Mr. Fountila once she found out that he was black, thereby terminating their telephone conversation. The plaintiffs testified that Mrs. Carter stated to them on April 13, 1974 that she knew she could not discriminate. Furthermore, there was evidence that Mrs. Carter continued to show the property to other applicants after telling the plaintiffs that the house had already been rented. From this and other evidence the jury was entitled to conclude that Mrs. Carter discriminated in conscious and deliberate disregard of the plaintiffs' rights.

The magnitude of the damages awarded presents a more serious problem. On the particular facts of this case, an award of $5,000 seems excessive. No pattern or practice of discrimination by Mrs. Carter, a woman well advanced in age, was demonstrated, but rather only a single, isolated incident. No evidence concerning Mrs. Carter's wealth or lack thereof—an important factor for the jury to consider in awarding damages designed to punish—was introduced, save for the fact that she owned a single piece of real property worth approximately $59,000.

It is clear, of course, that an otherwise supportable verdict must not be disturbed on appeal unless "grossly excessive", "monstrous", or "shocking to the conscience." *LaForest v. Autoridad de Las Fuentes Fluviales de Puerto Rico*, 536 F.2d 443, 446–47 (1st Cir. 1976); *Plumbers & Steamfitters Union, Local No. 598 v. Dillion*, 255 F.2d 820, 824 (9th Cir. 1958); *Baldwin v. Warwick*, 213 F.2d 485, 486 (9th Cir. 1954); *Covey Gas & Oil Co. v. Checketts*, 187 F.2d 561, 563 (9th Cir. 1951); *Southern Pacific*

*Co. v. Guthrie*, 186 F.2d 926 (9th Cir.), *cert. denied*, 341 U.S. 904, 71 S.Ct. 614, 95 L.Ed. 1343 (1951). Although we might well have concluded, had we been the triers of fact, that a lesser award would have been more appropriate under the circumstances, we are unable to apply those extreme characterizations here. However, a number of considerations which go beyond the mere size of the verdict combine in such a way as to convince us that the jury's award cannot be permitted to stand.

Firstly, the disparity between the award of actual damages and that of punitive damages is striking. The district judge himself characterized it as an "enormous discrepancy" in a hearing on the post-trial motions. While there need be no fixed ratio between awards of actual and punitive damages, and it has in fact been noted that a finding of actual damages is not a condition to the award of punitive damages under the Civil Rights Act of 1968, *Rogers v. Loether*, 467 F.2d 1110, 1112 n. 4 (7th Cir. 1972), *aff'd sub nom. Curtis v. Loether*, 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974), the large discrepancy here is consonant with our anxious concern that the verdict may have been reached in an improvident manner.

Secondly, an examination of the instructions given to the jury on the issue of punitive damages discloses two problems worthy of comment. These instructions read as follows:

> If you find for the plaintiff and find, from a preponderance of the evidence, that the acts of the defendant were maliciously or wantonly or oppressively done, then you may award the plaintiffs punitive damages in addition to actual damages or in addition to nominal damages such as you find.
>
> If you award punitive damages, they must be separately stated in your verdict.
>
> .    .    .    .    .
>
> You may also award plaintiff damages for their loss of civil rights and for their mental and emotional distress and if the circumstances warrant, punitive dam-

ages. Since punitive damages may be awarded, under either Federal or State law, you must consider the limitation or lack of limitation placed upon such damages by these laws. Of course you will consider the amount, if any, of punitive damages to be awarded according to the instructions I have already given you. However, you must keep in mind that the Federal law imposes no maximum limit on the amount that may be awarded while the State law imposes a limit of $250. If you conclude, according to the instructions I have given you, that the defendant is liable for the injuries claimed by plaintiffs, you may make an award in favor of each plaintiff against defendant for such injuries.

Now, if the jury should find, from a preponderance of the evidence in the case, that the plaintiffs are entitled to a verdict for actual or compensatory damages and should further find that the act or omission of the defendants which proximately caused actual injury or damages to the plaintiffs was maliciously or wantonly or oppressively done, then the jury may, if, in the exercise of discretion, they unanimously choose to do so, add to the award of actual damages such amount as the jury shall unanimously agree to be proper as punitive and exemplary damages.

An act or a failure to act is maliciously done if prompted or accompanied by ill will or spite or grudge either toward the injured person individually or toward all persons in one or more groups or categories of which the injured person is a member.

An act or failure to act is wantonly done if in reckless or callous disregard of or indifference to the rights of one or more persons including the injured person.

An act or failure to act is oppressively done if done in a manner which injures or damages or otherwise violates the rights of another person with unnecessary harshness or severity as by misuse or abuse of authority or power or by taking advantage of some weakness or disability or the misfortunes of another person.

Whether or not to make an award of punitive and exemplary damages in addition to actual damages is a matter exclusively within the province of the jury if the jury should unanimously find, from a preponderance of the evidence in the case, that the defendant's acts or omissions which proximately caused actual damage to the plaintiffs was [sic] maliciously or wantonly or oppressively done. But the jury should always bear in mind that such extraordinary damages may be allowed only if the jury should first unanimously award the plaintiffs a verdict for actual or compensatory damages and the jury should also bear in mind not only the conditions under which, and the burdens of proof [sic—should probably read "purposes"] for which the law permits an award of punitive and exemplary damages to be made, but also the requirement of the law that the amount of such extraordinary damages, when awarded, must be fixed with calm discretion and sound reason and must never be either awarded or fixed in any amount because of any sympathy or bias or prejudice with respect to any party in the case.

The latter five paragraphs of this portion of the charge were apparently adopted from plaintiffs' proposed instruction no. 37, which was in turn based upon what is now 3 Devitt & Blackmar, Federal Jury Practice and Instructions § 85.11 (3d ed. 1977). The first sentence of the proposed instruction, however, was omitted by the District Judge, presumably by inadvertence, because he had previously expressed to counsel in chambers his intention to give the instruction of which it was a part and did not thereafter notify counsel of any change in the proposed charge. The omitted sentence reads:

However, in addition to actual damages, the law permits the jury under certain circumstances, such as infliction of intentional wrongs, or the violation of a plaintiff's civil rights, to award the injured person punitive and exemplary damages, in order to punish the wrongdoer for some extraordinary misconduct, and to

serve as an example or warning to others not to engage in such conduct.

This omission was prejudicial to the appellant in that it had the effect of removing from the jury's consideration the only instruction setting forth the purpose of an award of punitive damages. The absence of notice to counsel of any changes in the instructions prior to summation may have been a reason for the failure of appellant's counsel to mitigate the effect of the omission by stressing the purposes of punitive damages in his closing argument.[3] While counsel for the plaintiffs did discuss the issue in summation, she limited her comments to the exemplary purposes of such damages and did not mention the primary purposes of deterrence and punishment.[4]

The absence of any clear instruction on the purposes of punitive damages takes on an added significance in light of the court's statement that "the federal law imposes no maximum limit on the amount that may be awarded". We are concerned that this language, while perhaps literally true, may have been misleading and productive of an excessive verdict.

The law suit was brought under both the Civil Rights Act of 1866, 42 U.S.C. § 1982 and the Fair Housing Act, 42 U.S.C. § 3601 et seq. The latter Act contains a provision limiting punitive damage awards to a maximum amount of $1,000, 42 U.S.C. § 3612(c), while the former makes no mention of punitive damages, nor does it place any limitation on the amount of such damages that may be awarded in cases brought under its authority. The courts, however, have permitted the recovery of punitive damages in cases arising under section 1982 and the question immediately arises as to what effect, if any, the $1,000 limitation in § 3612(c) has upon such awards.

Under normal rules of statutory construction, of course, we would be inclined to give great weight to the more recent and specific expression of Congressional intent, as set forth in the 1968 Act, that punitive damages awards not to exceed $1,000 are sufficient for the vindication of the federal policy against discrimination in housing. However, a number of courts, for reasons that we accept as valid, have reached the conclusion that the amount of punitive damages under section 1982 is not restricted by the $1,000 limitation in the Fair Housing Act. *Bishop v. Pecsok*, 431 F.Supp. 34, 38 n.7 (N.D.Ohio 1976); *Parker v. Shonfeld*, 409 F.Supp. 876, 879–880 (N.D.Cal.1976); *Clemons v. Runck*, 402 F.Supp. 863, 868, 871 (S.D.Ohio 1975); *Wright v. Kaine Realty*, 352 F.Supp. 222, 223 (N.D.Ill.1972).

Briefly stated, this conclusion rests upon several decisions of the Supreme Court which hold squarely that section 1982 stands independently of the 1968 Act, and that Congress intended to effect no change, either substantive or procedural, in the prior statute. *Jones v. Mayer Co.*, 392 U.S. 409, 416–417 n.20, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968); *Sullivan v. Little Hunting Park*, 396 U.S. 229, 237–238, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969). This confirmed the view which the Attorney General of the

3. It should be noted that while counsel for the appellant cites as error the district court's omission of the first sentence in plaintiffs' proposed instruction no. 37, he had in fact objected to its use at trial on the ground that it was "too vague". This objection was overruled.

4. Ms. Jay, counsel for the plaintiffs at trial, concluded her closing statement with the following remarks on the purpose of punitive damages:

The next thing that we are requesting is exemplary damages, or punitive damages. I would like to talk to you about exemplary damages. That means damages to set an example. That means to set an example so that people know that this kind of thing can-

not be tolerated. But in this country we are to treat all people alike. And not discriminate on the basis of race. We are not saying the Fountilas should have gotten it there and then. Their right to be put in the same basket as everyone else and looked upon as the same as anyone else. To say that they are black and therefore not acceptable is unlawful. They had the same right as anyone else to compete for that house. So we are asking you also to award exemplary damages in the amount that you see fit, so that other people will know and understand that this is against the law and the law must be applied equally to all people. And that it is against the law to discriminate on the basis of race.

United States expressed at oral argument in the *Jones* case. 392 U.S. at 416–417 n.20, 88 S.Ct. 2186.

It is thus clear that the plaintiffs were not restricted to $1,000 punitive damages as a matter of law. Nonetheless, we think it appropriate in cases of this sort for the jury to be instructed that, while it is not binding on them, the limitation expressed by Congress in section 3612(c) may be taken into account as an indication of what might constitute a reasonable and appropriate award.[5]

It is therefore our conclusion that the case must be remanded for a new trial, limited, in view of the circumstances, to the issue of punitive damages. Fed.R.Civ.P. 59(a).

## IV.

### The Award of Attorneys' Fees

Plaintiffs originally requested attorneys' fees in the prayer for relief of their complaint. After the trial plaintiffs submitted a "declaration in support of request for attorneys' fees," attached to which was a summary of time spent by their attorneys in preparing for and conducting the trial. The total amount claimed was $3,562.50. The defendant's "response to plaintiffs' claim for attorneys' fees and supporting declaration" disputed certain aspects of plaintiffs' declaration, including time allegedly spent and the valuation of counsels' services. The defendant requested an evidentiary hearing on these disputed facts and on the question of the plaintiffs' financial ability to assume their own attorneys' fees. Finally, counsel for the plaintiffs submitted a "supplemental declaration in support of claim for attorneys' fees," which sought to meet certain allegations raised by the defendant's responsive memorandum.

The request for fees was granted summarily by the District Court, as evidenced by the following colloquy:

[THE COURT:] And with respect to the attorneys' fees, I grant Mr. Thompson's at the rate of $50 an hour, and Ms. Jay at the rate of $40 an hour. And I believe that comes to $2,940.

MR. FLOCKS: Your Honor, may I speak to that issue briefly?

I wonder if the Court has read the recent case about *Alaska Pipe Line* [*sic*] decided May 12th by the Supreme Court. As I read that case, it would require that the Court can only award attorney fees under Section 361—3612, because it would require a finding that the defendant's unable to bear the costs of the litigation. Now I have filed a memorandum in opposition to their request for attorney fees. And the declaration is hearsay, and I want an opportunity to go over each of these items line by line in Court.

THE COURT: Mr. Flocks, I have indeed read Justice White's opinion in the *Alaska Pipe Line* [*sic*] case, and it holds very clearly that where the statute provides for attorney fees, the Court will grant attorney fees, and that's what I'm doing in this case. I have reviewed the certificate, I find that it's reasonable, and that's the order. Now, if you want—the next step is the Court of Appeals.

The defendant subsequently submitted a "request for findings of fact and conclusions of law" with respect to the fees award, but there is no indication in the record that any action was taken by the court in response to it.

At the time of trial there was some question as to the proper standards to be applied in awarding attorneys' fees in cases of this sort. While the Civil Rights Act of 1968 expressly permitted the award of reasonable attorneys' fees to a prevailing plaintiff, this was conditioned on a finding that the plaintiff was financially unable to assume them. 42 U.S.C. § 3612(c). This condition could apparently be circumvented by seek-

---

**5.** Such an instruction was given in *Clemons v. Runck*, 402 F.Supp. 863, 868 (S.D.Ohio 1975), and approved, although *not given*, in *Parker v. Shonfeld*, 409 F.Supp. 876, 880–881 (N.D.Cal. 1976). *See also Hughes v. Dyer*, 378 F.Supp. 1305, 1311 (W.D.Mo.1974), in which it was held that "appropriate consideration" should be given to the limitation in § 3612(c) when making awards of punitive damages under 42 U.S.C. § 1982.

ing an award directly under section 1982, one of the plaintiffs' alternative statutory bases, but, Congress not having explicitly authorized such awards in that section, this involved coming within one of the exceptions to the "American rule" generally disallowing attorneys' fees, as enunciated by the Supreme Court in cases such as *Alyeska Pipeline Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). *See Parker v. Shonfeld*, 409 F.Supp. at 882–884.

The enactment of the Civil Rights Attorneys' Fees Act of 1976, Pub.L.No.94–559 (Oct. 19, 1976), which amended 42 U.S.C. § 1988 to permit the allowance of a reasonable attorneys' fee to the prevailing party "in any action or proceeding to enforce a provision of sections 1981, 1982   .   .   . of this title", put these questions into a new context. This Act has been held applicable to cases pending appellate review at the time of its enactment, which is the case here, this appeal having been filed on June 30, 1975. *Williams v. Anderson*, 562 F.2d 1081, 1102 (8th Cir. 1977); *Wharton v. Knefel*, 562 F.2d 550, 557 (8th Cir. 1977); *Rosado v. Santiago*, 562 F.2d 114, 118 (1st Cir. 1977); *Bond v. Stanton*, 555 F.2d 172, 174 (7th Cir. 1977); *Stanford Daily v. Zurcher*, 550 F.2d 464, 466 (9th Cir. 1977). *See also Bradley v. Richmond School Board*, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974). [".   .   . a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary."]

Although the Act itself is silent on the standards to be applied in determining what constitutes a "reasonable" attorneys' fee, a number of courts have enumerated factors to be taken into consideration in fixing the amount of an award. One of the most frequently cited lists of such factors can be found in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), where the court found it necessary to vacate an award of attorneys' fees and remand for reconsideration in light of the following guidelines: (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal services properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases. 488 F.2d at 717–719. This case was commented on favorably in the legislative reports underlying the 1976 Act, *see* H.R.Rep.No.94–1558, 94th Cong.2d Sess. 8 (1976), S.Rep.No.94–1011, 94th Cong.2d Sess. 6 (1976); U.S.Code Cong. & Admin.News 1976, p. 5908, and its guidelines were adopted by this court in *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975), *cert. denied* 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976), *See also Stanford Daily v. Zurcher*, 64 F.R.D. 680 (N.D.Cal.1974), *aff'd* 550 F.2d 464 (9th Cir. 1977), which was also favorably noticed in the Senate report underlying the Act. ["The appropriate standards, *see Johnson v. Georgia Highway Express* .   .   ., are correctly applied in such cases as *Stanford Daily v. Zurcher*, .   ..." S.Rep.No.94–1011 at 6, 1976 U.S.Code Cong. and Admin.News pp. 5908, 5913]. Additionally, we note that at least one court has indicated that the financial ability of plaintiffs to bear their own attorneys' fees, the absence of which was required by Congress for awards under the Fair Housing Act, should be taken into account in determining the amount of awards under section 1982. *Hughes v. Repko*, 429 F.Supp. 928, 933 (W.D.Pa.1977).

The record on this appeal does not indicate which of the above factors, if any, were taken into account by the district court in determining the amount of the attorneys' fees awarded. In this posture, a "meaningful review is impossible." *Kerr, supra* at 70. On the retrial of this case, therefore, the district court should issue

findings of fact and conclusions of law with respect to its award of fees and make any appropriate adjustments to the award under the criteria we have discussed.

The judgment of the district court is affirmed as to liability and the award of compensatory damages, but vacated and remanded for a new trial on the issue of punitive damages and for further proceedings not inconsistent herewith.