SHAKEY'S INCORPORATED, Plaintiff-Appellant,

v.

Isabel COVALT, Covalt Enterprises, Inc., Pi Arn Squared, Inc., d/b/a Suspenders Pizza, Fred Jansen, and Sande Dahl, Defendant-Appellee.

SHAKEY'S INCORPORATED, Plaintiff-Appellee,

v.

Isabel COVALT, Covalt Enterprises, Inc., Pi Arn Squared, Inc., d/b/a Suspenders Pizza, Fred Jansen, and Sande Dahl, Defendants-Appellants.

Nos. 81–3166, 81–3185.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 8, 1982.

Decided April 18, 1983.

Peter R. Taft, Munger, Tolles, Rickershauser, Los Angeles, Cal., for Shakey's Inc.

Garry P. McMurry, Rankin, McMurry, Osburn, Vavrosky & Doherty, Portland, Or., Richard A. Carlson, Drakulich & Carlson, Portland, Or., for Isabel Covalt, et al.

Before CHOY, TANG, and BOOCHEVER, Circuit Judges.

BOOCHEVER, Circuit Judge:

This case involves claims of trademark infringement, unfair competition, and breach of contract. It arose after the defendant pizza parlor operators terminated their affiliation with Shakey's Inc. (Shakey's), a national pizzeria chain. After letting a franchise agreement with Shakey's expire, the defendants continued to operate their pizza parlors under different names ("Izzy's" [3 parlors] and "Suspenders" [1 parlor]). Because of alleged similarities between the former Shakey's operations and new Izzy's operations, Shakey's sued Isabel Covalt and Covalt Enterprises (the Covalt defendants) for unfair competition and two counts of trademark infringement. It sued all defendants for alleged breaches of both the franchise agreement and a parlor remodeling agreement. The trial court directed a verdict for the Covalt defendants on the unfair competition, the slogan/menu name infringement, and the breach of the remodeling agreement claims. It directed a verdict for defendants Dahl and Pi Arn Squared on the breach of contract claims. The jury returned a verdict for the Covalt defendants on the other claims. The court awarded the defendants costs and attorney's fees. Shakey's appeals the directed verdicts and fee awards. The Covalt defendants cross-appeal for costs not allowed.

We affirm in part and reverse in part. The directed verdicts on the trademark infringement and unfair competition claims were appropriate because the evidence was insufficient to show a "likelihood of confusion." We reverse the directed verdicts on the breach of the remodeling agreement claims as to the Covalt defendants and Pi Arn Squared, and affirm as to Dahl. We affirm the attorney's fee and cost awards.

### Facts

In 1958, Shakey's granted James Covalt franchises for Albany, Salem, and Corvallis, Oregon. In 1970, Mr. Covalt and his wife, Isabel Covalt, created Covalt Enterprises, Inc., to operate their Shakey's outlets. In 1976, the Covalts turned over the management of their North Salem parlor to defendants Arnie Dahl (their nephew) and Pi Arn Squared, Inc. (51% owned by the Covalts, 49% owned by Dahl and his parents). In 1976, Fred Jansen (Isabel Covalt's son) assumed the managerial responsibilities for the Covalts' three parlors in Albany and Corvallis. Upon Mr. Covalt's death in 1978, Isabel Covalt (Covalt) succeeded to all of her husband's interests, rights, and obligations with regard to Shakey's.

Shakey's dealer franchise agreement with Covalt provided that her franchises would expire on June 17, 1979.[1] Prior to that date, negotiations to renew the franchises failed. Upon expiration of the franchise agreement, Isabel Covalt changed the name of her Albany and Corvallis parlors to "Izzy's," a nickname taken from her first name. At the same time, the name of the North Salem parlor was changed to "Suspenders." Covalt also returned all confidential manuals to Shakey's, discontinued use of Shakey's registered trademarks and its spice blends, and removed all Shakey's signs and artwork. In addition, she distrib-

uted handouts at the Albany and Corvallis parlors, announcing that "On Sunday, June 17, we're going to get a new name— IZZY's." Izzy's also advertised that "We've changed our name, but not our style." Despite Shakey's demands to do so, Covalt did not remodel her parlors, discontinue use of the color scheme in the restaurants, alter the parlors' offerings (although she changed the menu items' names), or immediately change the parlors' telephone listings. Because of the alleged similarities between the Covalt restaurants and Shakey's outlets, Shakey's charged the defendants with unfair competition and two counts of trademark infringement.[2]

Shakey's also charged all defendants with breach of a remodeling agreement. Allegedly, Shakey's had commissioned the creation of a new interior and exterior design for its parlors, called the "Devine Design." In 1977, James Covalt signed a Remodel Agreement, whereby he agreed to remodel his parlors to conform with the Devine Design, to join the Portland Advertising Group (Portland ADI), and to "pay a full share of funds required for [the Portland ADI's] joint advertising plans." Dahl signed a similar agreement, pertaining to the North Salem parlor, which was never executed by Shakey's. Jim Covalt and Shakey's subsequently executed a copy of the same agreement for the North Salem parlor. Covalt ceased making payments to the Portland ADI in December, 1978, and Dahl and Pi Arn Squared ceased in January, 1979.

In the proceedings below, the district court directed a verdict for Covalt and Covalt Enterprises (the Covalt defendants) regarding the slogan/menu name infringement, unfair competition, and breach of the remodeling agreement charges. The court submitted the "Devine Design" trademark infringement claim and the breach of the

---

1. The agreement was to last 20 years from the date the franchise obtained a valid liquor license. The Covalts obtained their first liquor license on June 17, 1959. The jury found that the franchises for all four of the Covalt restaurants expired on the same day. Shakey's does not challenge that finding.

2. One count alleged infringement on Shakey's parlor decor and style, known as the Devine Design. The other alleged infringement on Shakey's unregistered trade slogan and trade names (*i.e.,* menu item names). This later count is referred to below as the slogan/menu name infringement claim.

franchise agreement claim against the Covalt defendants to the jury, which returned a verdict in their favor. Shakey's appeals the three directed verdicts. Regarding Dahl and Pi Arn Squared, the court directed verdicts in their favor on both the breach of the franchise agreement and breach of the remodeling agreement charges. Shakey's appeals only the latter ruling. Other charges against these defendants, including a trademark infringement claim, were disposed of in their favor during the trial and are not challenged in this appeal.[3]

Following trial, the court awarded attorney's fees to the Covalt defendants on the breach of the franchise agreement claim and to Dahl and Pi Arn Squared on both the trademark infringement and the breach of the franchise agreement claims. It also initially awarded Covalt all requested costs, an amount it later reduced. Shakey's appeals the attorney's fee awards on the franchise agreement claims, and Covalt appeals the modified cost award.

## I.

### The Directed Verdicts

■ The standard for reviewing the propriety of a directed verdict is the same on appeal as it is below. *California Computer Products v. IBM Corp.,* 613 F.2d 727, 734 (9th Cir.1979). A directed verdict is proper if the evidence permits only one reasonable conclusion as to the verdict. *Fountila v. Carter,* 571 F.2d 487, 489–90 (9th Cir.1978). It is improper if there is substantial evidence to support a finding for the non-moving party. *California Computer Products,* 613 F.2d at 734. In ruling on motions for a directed verdict, we must view the evidence

as a whole and draw all possible inferences in favor of the non-moving party. *Id.* at 735.

### A. Trademark Infringement and Unfair Competition[4]

Shakey's contends that the Covalt defendants infringed on the unregistered servicemark and trademarks it allegedly has for its slogan and menu names.[5] Specifically, it provides the following comparison of Shakey's and Izzy's slogans and menu names:

| | Shakey's | Covalt's |
|---|---|---|
| slogan: | "Shakey's – World's Greatest Pizza" | "Izzy's — Home of the World's Finest Pizza" |
| menu names: | "Manager's Choice" | "Our Choice" |
| | "Royal Canadian" | "Canadian Delight" |
| | "Pizzarito" | "Tacorito" |
| | "Shakey's Special" | "Izzy's Special" |
| | "The Deli" | "Izzy's Deli" |

Shakey's also charges the Covalt defendants with unfair competition. In this regard, Shakey's complains that the Izzy's parlors copied its menu content, its prices, the ingredients used in the pizzas and sandwiches, and its "style of presentation." It also complains that the Covalt defendants continued to use the Devine Design and that they did not promptly change their telephone number and listing. This alleged "mimicry" purportedly deceived the public, and enabled Izzy's to derive benefit from Shakey's good will. Following Shakey's presentation of its case, the district court directed a verdict in the defendants' favor on the slogan/menu name infringement claims. It did the same on the unfair competition claim after hearing Covalt's evidence. We affirm both rulings.

**3.** Although Shakey's named Jansen as a defendant in its complaint, it advanced no claim against him and acquiesced in the court's decision to direct a verdict in his favor. Shakey's does not challenge that ruling in this appeal.

**4.** Shakey's pursues this claim only against the Covalt defendants on appeal.

**5.** Although neither its slogan nor its menu names are registered marks, Shakey's contends that the slogan and names are "distinctive," and are entitled to protection under the Lan-

ham Act, 15 U.S.C. § 1125(a) (1976), and Oregon common law. *See International Order of Job's Daughters v. Lindeburg & Co.,* 633 F.2d 912, 917 (9th Cir.1980), *cert. denied,* 452 U.S. 941, 101 S.Ct. 3086, 69 L.Ed.2d 956 (1981); *New West Corp. v. NYM Co.,* 595 F.2d 1194, 1198 (9th Cir.1979). We need not address the "distinctiveness" issue because we find that Shakey's failed to show "likelihood of confusion" as required for an infringement claim under state and federal law.

The gravamen of both an infringement and an unfair competition claim is whether the defendant has created a "likelihood of confusion." *See* 15 U.S.C. § 1125(a) (1976); Or.Rev.Stat. § 646.-608(1)(b) (1981); *New West Corp. v. NYM Co.,* 595 F.2d 1194, 1201 (9th Cir.1979); *88¢ Stores, Inc. v. Martinez,* 227 Or. 147, 153, 361 P.2d 809, 812 (1961). Likelihood of confusion exists when consumers are likely to assume that a product or service is associated with a source other than its actual source because of similarities between the two sources' marks or marketing techniques. *See Alpha Industries, Inc. v. Alpha Steel Tube & Shapes, Inc.,* 616 F.2d 440, 443 (9th Cir.1980); *B.H. Bunn Co. v. AAA Replacement Parts Co.,* 451 F.2d 1254, 1263 (5th Cir.1971). In determining whether confusion between related goods is likely, the following factors are relevant: similarities between the protected and the allegedly infringing marks, the class of goods in question and the corresponding degree of care likely to be exercised by purchasers in selecting a product, the marketing channels, the intent of the alleged infringer, evidence of actual confusion,[6] and the fame of the prior mark. *Alpha Industries,* 616 F.2d at 444; *Carter-Wallace, Inc. v. Procter & Gamble Co.,* 434 F.2d 794, 800 (9th Cir.1970). In addition to these factors, in this case we must also take into account the fact that Covalt was not entering a market, but was a former Shakey's franchisee who had chosen to let her affiliation with Shakey's expire and to continue operating her pizza parlors independently. *See* 3 R. Callmann, *Unfair Competition, Trademarks, and Monopolies* § 82.2(b)(3) (3d ed. 1969). In doing so, we must balance deterrence of improper marketing techniques against unreasonable impairment of the operation of market forces. Having reviewed the record in light of these considerations, we hold that Shakey's has presented insufficient evidence as a matter of law to establish that the Covalt defendants created a likelihood of confusion.

In reference to its infringement claim, Shakey's presents a side-by-side comparison of names and slogans in an attempt to rely, in part, on the visual and verbal similarities between its and Izzy's names and slogans. We note, however, that the same comparison reveals noticeable dissimilarities. It may be true, in some cases, that the visual dissimilarities can be disregarded. We must approach the likelihood of confusion inquiry from the perspective of the marketplace. *See, e.g., Sun-Fun Products, Inc. v. Suntan Research & Development Inc.,* 656 F.2d 186, 189 (5th Cir.1981); *Alpha Industries,* 616 F.2d at 444; *AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 353 (9th Cir.1979). We note that the public pay relatively little attention to product marks on inexpensive goods. *Chesebrough-Pond's, Inc. v. Faberge, Inc.,* 666 F.2d 393, 398 (9th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 294, 74 L.Ed.2d 277 (1982).

It is equally true, however, that the similarities, standing alone, are of little persuasive force in this case. In selecting a pizza parlor, pizza eaters are likely to be influenced by a variety of factors, such as restaurant location, menu variety, product quality, restaurant cleanliness and decor, as well as by advertising. We think it unlikely that, once inside an Izzy's parlor, a customer would order an "Izzy's Deli," "Our Choice," or "Tacorito" and expect to get a Shakey's product solely because of the alleged similarities between those names and Shakey's names. In reference to its unfair competition claim, Shakey's points to many visual similarities between the old Shakey's and the new Izzy's parlors. After separating the wheat from the chaff in Shakey's evidence of improper marketing, we find that little remains of its case. For example, "functional" similarities alone between the new Izzy's and the old Shakey's cannot be a valid basis for an unfair competition claim. *See Job's Daughters,* 633 F.2d at

---

**6.** Only likelihood of confusion, not actual confusion, need be shown to establish a claim. Further, actual confusion is not necessary to a finding of likelihood of confusion. *See, Amstar*

*Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 263 (5th Cir.), *cert. denied,* 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980).

917. Covalt's buildings were standing, and had even undergone partial remodeling pursuant to the Covalts' participation in the Devine Design program, when she converted them into Izzy's parlors. The parlors had established and limited kitchen facilities, and their employees were trained in preparing certain kinds of food. The parlors also had established relationships with suppliers. Thus, we cannot condemn the Covalt defendants for physical similarities between their parlors and Shakey's outlets, nor for continuing to offer the same menu items in their parlors. Nor do we think the fact that the Covalt defendants used photographs on their menus has significant persuasive force. The record shows that other restaurants do the same, which weighs against Shakey's claim to a distinctive menu. *See* 3 R. Callmann, *supra* § 74.1.

In attempting to establish likelihood of confusion[7] Shakey's relies heavily on purported evidence of actual confusion. Without assessing the validity with which Shakey's and the Covalts' market surveys measured the degree of actual confusion, *see Amstar Corp.*, 615 F.2d at 264,[8] we note that Shakey's has not adequately addressed the possible causes of that confusion. It merely assumes that the similarities between Shakey's and Izzy's that allegedly offend the trademark laws and the law of unfair competition cause that confusion. Shakey's survey, however, contained a statistic that goes far in rebutting its own allegations: "33% [of the sample group] believed that there was still a business relationship between Shakey's and Izzy's."

The law of unfair competition does not impose upon the Covalts a duty to ensure that all customers are aware that they are no longer affiliated with Shakey's, but merely a duty not to promote the perpetuation of the perception that they are. *See Kampgrounds of America, Inc. v. North Delaware A–OK Campground, Inc.*, 415 F.Supp. 1288 (D.Del.1976), *aff'd mem.*, 556 F.2d 566 (3d Cir.1977); 3 R. Callmann, *supra* § 82.2(b)(3). In *Kampgrounds of America*, the KOA franchiser sued a former franchisee for infringement of service mark and unfair competition because he had used the name "A–OK" and a logo slightly similar to KOA's. The district court rejected both claims, relying extensively on the fact that the defendant had made a good faith effort to avert confusion. The court reasoned, "at the worst, he is guilty of some negligence in not being more thorough.... In all, he attempted to do everything he thought was necessary to advise his clientele of defendant's change of status and to avoid confusion." 415 F.Supp. at 1297. This case is similar. The Covalts engaged in an advertising campaign to avoid confusing their former customers; any confusion between Izzy's and Shakey's was more likely attributable to their prior relationship than to anything defendants did "to obscure the licensee's change of status." *Id.*

Finally, Shakey's suggests that the similarities between Shakey's and Izzy's operations would permit an inference of an intent to deceive customers. The trial evidence, however, overwhelmingly shows that Covalt had a laudable intent and took substantial steps to disassociate her parlors from Shakey's. Not only did she remove indicia of her prior affiliation with Shakey's, such as signs and art work, she conducted a leafletting campaign to inform patrons of her parlor's name change and engaged in a costly ($81,000), multi-media

---

7. Shakey's correctly points out that, under Oregon law, when there is evidence of *actual* confusion among consumers, the court may not rule that competing tradenames are dissimilar as a matter of law. *See Frostig v. Saga Enterprises, Inc.*, 272 Or. 565, 572, 539 P.2d 154, 158 (1975). This principle of law does not help Shakey's in this case. In *Frostig,* there had been no prior relationship between the parties, thus the court could presume that the confusion was caused by similarities in the names in issue. Here, Shakey's has *not* shown that the confusion was caused by similarities in the parlors' slogans or names rather than by the fact of their prior relationship. Indeed, Shakey's evidence suggests that the prior relationship was the cause of the confusion.

8. "[T]he courts have often discounted ... evidence [of actual confusion] because it was unclear and insubstantial." *AMF, Inc.*, 599 F.2d at 352.

advertising campaign. Her advertising agent testified regarding the Izzy's campaign:

> It was going to be a new name, a new face and everything; they wanted a new advertising image so they wouldn't confuse their customers; they wanted to let the people know Izzy's would still be around because she has got alot of friends; it's a small town; she has done alot of benevolent work. It's good for business. We had to make sure Isabel's name was used in the newspaper ad; we came up with the name Izzy's; we put our blessing on the theme. Most people called her Izzy's, but our goal basically was to inform the people in the local area that there was an Izzy's and they had super food and services.... But, ... we had to try to make it look as differently as we could from any other pizza parlor, not only Shakey's, but all.

Izzy's also adopted a different menu, which varied from Shakey's in color combination, paper stock, and how it was folded, and changed their phone numbers within three months after their disassociation from Shakey's. These efforts clearly satisfied Covalt's obligation to take precautions to avoid trading on a competitor's good name. *See Kampgrounds of America,* 415 F.Supp. at 1297. To require more might unreasonably distort the operation of market forces by deterring some franchisees from discontinuing unsatisfactory franchise relationships.

There was insufficient evidence of "likelihood of confusion" to support a finding of infringement. Likewise, the unfair competition claim cannot stand. Although Shakey's presented some evidence to support its charge of unfair competition, the defendants' arguments and evidence adequately refuted the charge as a matter of law, precluding jury consideration of the issue. The district court properly directed verdicts for the defendant on the infringement and unfair competition claims.

**B. Breach of Contract**

The Covalts agreed to incorporate the Devine Design into each of their parlors, and entered into written agreements with Shakey's which provided that Shakey's would supply remodeling plans and specifications, that the Covalts would remodel their parlors, and that Shakey's would reimburse part of the remodeling costs. The agreement further provided that:

> D. As conditions precedent to the obligations of Shakey's set out in paragraphs A, B and C, above, DEALER shall fulfill the following requirements:
>
> .   .   .   .   .
>
> 3. DEALER shall join and continue membership in the Portland Area Advertising Group [ADI] and participate in joint advertising with other dealers in the Group in accordance with the following terms and conditions:
>
>> a. DEALER shall join with other dealers in the above advertising Group in joint advertising plans and shall participate in such plan whenever a majority of the parlors in that Group agree to a plan;
>>
>> b. DEALER shall pay a full share of funds required for such joint advertising plans as such full share may be ascertained by the Group, ... provided that the Group's method of allocating DEALER'S share of such funds is reasonable ....

Dahl signed an agreement covering the North Salem parlor identical to that signed by Covalt's husband. Shakey's, however, never signed the agreement executed by Dahl. The defendants stopped mailing payments to the Portland ADI in late 1978 and early 1979 although the franchise was not terminated until June 17, 1979.

Shakey's alleged at trial that the defendants breached their contracts with Shakey's when they stopped sending payments to the ADI.[9] The Covalts responded that they

---

**9.** With regard to whether Shakey's is a real party in interest with respect to this alleged contractual breach, an argument which defend-

ants raised at trial but have apparently abandoned on appeal, see Fed.R.Civ.P. 17(a), which provides in part:

were not obligated to participate in the 1979 ADI advertising campaign because they were not party to the ADI's 1979 oral extension of the written 1978 agreement. Dahl and Pi Arn Squared argued that they were not bound to the agreement signed by Dahl because Shakey's had never signed it, nor had Shakey's otherwise shown any intention to be bound by it. The court directed a verdict for all defendants without explanation. The parties raise the same arguments in this appeal. The defendants also argue that participation in the ADI was merely an unsatisfied condition precedent to the creation of obligations on Shakey's part.

### 1. Defendant Dahl

The record shows that Dahl signed a copy of the Parlor Remodel Agreement. Shakey's argues that this fact alone was sufficient to submit to the jury the question of whether Dahl was a party to the remodeling agreement. Because the record contains overwhelming evidence to the contrary, we disagree and, accordingly, affirm the verdict directed in favor of defendant Dahl.

■ The text of the document signed by Dahl bears no indication that it is an agreement between him and Shakey's; to the contrary, the document states on its face that it is an agreement between Shakey's and Jim Covalt. In addition, Dahl explained at trial that he signed the remodeling agreement because, as a Shakey's representative had explained to him, he needed to do so in order to receive the Devine Design plans for the North Salem parlor. The representative had also explained, however, that the franchise dealer, *i.e.*, the Covalts, would also have to sign a remodeling agreement for the North Salem parlor before Shakey's would supply the plans.

Subsequent events confirmed the accuracy of the representative's statement. Shakey's never executed the agreement signed by Dahl. Instead, it wrote the Covalts to inform them that it had not yet received a signed copy of the agreement for the North Salem parlor. Mr. Covalt and Shakey's subsequently executed an agreement regarding that parlor. This evidence of Shakey's pre-execution conduct would preclude a reasonable jury from finding that Dahl was ever party to an agreement with Shakey's.

### 2. The Covalt Defendants and Pi Arn Squared

■ We reject the defendants' argument that they were not obligated to contribute to the ADI because they never accepted the 1979 oral extension of the 1978 agreement. This argument is contrary to the express terms of the Remodel Agreements, which impose obligations on all Dealers in the ADI if "a majority of the parlors in that Group agree to a plan." The record indicates that a majority agreed orally to extend the 1978 agreement.

■ The defendants' argument that their obligation to pay was a "condition precedent," the performance of which Shakey's had no right to compel, is also unavailing. The "condition precedent" language and the concomitant promise to continue membership in the Portland ADI are inherently inconsistent, because an ongoing obligation cannot operate as a condition precedent.

■ Any ambiguity is resolved by resort to common canons of interpretation. A written contract must be read as a whole and every part interpreted with reference to the whole. *See* 4 S. Williston, *A Treatise on the Law of Contracts* § 618, at 710 (3d ed. 1961). Preference must be given to reasonable interpretations as opposed to those that are unreasonable, or that would make the contract illusory. *See Elte, Inc. v. S.S. Mullen, Inc.*, 469 F.2d 1127, 1131 (9th Cir.1972); 4 S. Williston, *supra* § 619, at 731. A condition precedent could not reasonably be found in the contract at issue since several of the purported conditions

Every action shall be prosecuted in the name of the real party in interest.... [A] party ... in whose name a contract has been made

for the benefit of another ... may sue in his own name without joining with him the party for whose benefit the action is brought ....

were not to occur until *after* Shakey's had fulfilled its contractual obligations. For example, one condition provided that the Covalts would not advertise the Devine Design for at least thirty days after completing the necessary modifications so that any operational problems could be remedied. Another provided that the Covalts devote a fixed percentage of their gross receipts to local advertising after the modifications were completed. With these indicia that the parties contemplated a mutual exchange of obligations, the district court should have wholly disregarded the "condition precedent" language. *Accord* 4 S. Williston, *supra* § 619, at 737. This would have been especially appropriate since the purported conditions were within the exclusive control of one of the contracting parties. *See Lockwood v. Wolf Corp.,* 629 F.2d 603, 610 (9th Cir.1980).

We hold that the clause in issue, when the contract is read as a whole, must be interpreted as imposing an affirmative obligation on the defendants in spite of the "condition precedent" language. The court should have granted Shakey's motion for a directed verdict on this issue.[10]

## II.

### Attorney's Fees

*A. The Covalt Defendants*

The trial court denied the request for attorney's fees with regard to the trademark infringement claim, but granted a $76,511.65 award on the breach of the franchise agreement claim pursuant to Or.Rev. Stat. § 20.096(1) (1981) (allowing award of attorney's fees against either party when contract provides for attorney's fee recovery from one or both contractual parties).[11]

State law governs the award of attorney's fees in diversity actions. *Kabatoff v. Safeco Ins. Co.,* 627 F.2d 207, 210 (9th Cir.1980); *Schulz v. Lamb,* 591 F.2d 1268, 1272 (9th Cir.1978). The parties agree that Oregon law imposes liability for attorney's fees on Shakey's regarding the breach of the franchise agreement claim. Shakey's however, challenges the manner in which the court made its award, namely the failure to hold a full-scale evidentiary hearing and to discuss the *Kerr* factors.[12]

The decision to hold an evidentiary hearing when making an attorney's fee award is a matter of procedure, and is therefore governed by federal law under the *Erie* doctrine.[13] We have previously affirmed attorney's fee awards supported by ample evidence without requiring an evidentiary hearing. *See, e.g., Manhart v. City of Los Angeles,* 652 F.2d 904, 908 (9th Cir.1981); *Williams v. Alioto,* 625 F.2d 845, 849 (9th Cir.1980), *cert. denied,* 450 U.S. 1012, 101 S.Ct. 1723, 68 L.Ed.2d 213 (1981); *Dennis v. Chang,* 611 F.2d 1302, 1308 (9th Cir.1980). We reach the same result here, holding that (1) the record contains ample evidence to support the attorney's fee award and (2) the district court's ruling was sufficiently detailed to permit review.

The jury trial ended on August 5, 1980. On August 25, the Covalt defendants moved for an assessment of attorney's fees. They filed a memorandum and affidavit in support of the motion. On August 26, the court ordered a hearing for October 3 which was later postponed until October 6. On October 3, Shakey's filed an opposing mem-

---

**10.** On remand, the district court will have to determine which defendants are responsible for what amounts. In making this determination, it will have to give particular attention to the capacity in which Covalt's husband signed the Remodel Agreement for the North Salem parlor, whether in a personal capacity or as an agent for either Covalt Enterprises or Pi Arn Squared. We also note that the amounts owing, as opposed to the liability issue, were undisputed at trial: $7,063.66 for the Albany and Corvallis parlors, and $1,661.20 for the North Salem parlor.

**11.** Only the franchise agreement claim is relevant with regard to the attorney's fee award because the remodeling agreement did *not* contain an attorney's fee reimbursement clause.

**12.** *See Kerr v. Screen Extras Guild, Inc.,* 526 F.2d 67, 69–70 (9th Cir.1975), *cert. denied,* 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976).

**13.** *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

orandum. On October 6, the defendants submitted an additional affidavit. On that day, the district judge heard argument on the motion, although most of the argument was addressed to whether an award should be made rather than to the amount of the award.

This court has affirmed attorney fee awards on similar records. In *Manhart,* the court ruled that "[t]he facts contained in the affidavits and briefs submitted by the parties are sufficiently detailed to provide a basis for the award." 652 F.2d at 908. In *Dennis,* the court ruled that four affidavits provided sufficient detail to support an award. 611 F.2d at 1308. The Covalt affidavits adequately itemized work performed. Moreover, the amount claimed was based on the fees actually paid by the Covalts for services rendered in the case.

The court's opinion contains adequate discussion to enable review. The court correctly noted that "[i]t is impossible to divide precisely the time spent on any particular issue in this case because each claim overlapped." It also remarked that the award of $76,511.65 was "reasonable" in light of the complexity of the case and the skill of the attorneys. The court considered the time and labor required, the amount involved, the results obtained, the varying experience of the attorneys involved and customary fees. In doing so, the court adequately referred to the applicable *Kerr* factors. *See Manhart,* 652 F.2d at 908. The district court's ruling survives review under either the abuse of discretion standard, *Manhart,* 652 F.2d at 907, or the clearly erroneous standard, *see Kabatoff,* 627 F.2d at 210 (a determination of reasonable attorney's fees is a question of fact under Oregon law).[14]

### B. *Dahl/Pi Arn Squared*

The district court awarded these defendants $28,194.50 in attorney's fees on both the trademark infringement and the breach of the franchise agreement claim. The award on the infringement claim is not at issue.

On the breach of the franchise agreement claim, the court applied Oregon law and ruled that a nonparty to a contract could recover under an attorney's fee provision in the contract and Or.Rev.Stat. § 20.-096 when the nonparty successfully defends against a claim that he or she is liable under the contract. The Oregon District Judge's conclusion on a question of Oregon law is entitled to substantial deference, and is reversible only if clearly wrong. *See United States v. County of Humboldt, California,* 628 F.2d 549, 551 (9th Cir.1980).

In concluding that Oregon would allow such an award, the district court relied on (1) the fact that Oregon's statute is patterned after California's, and that California now allows such awards [15] and (2) the fact that the Oregon Court of Appeals reached the same result.[16] In the absence of a ruling by Oregon's highest court to the contrary, we cannot find clear error.

### III.

### Costs

The court's cost award initially provided for reimbursement of $11,230 expended by the Covalts in obtaining the two surveys used at trial ($3,300 for a copy of plaintiff's and $7,930 to conduct its own). The court later amended its order to remove this amount because Covalt defendants "are not

---

**14.** It gives us some cause for concern that district courts occasionally award large attorney's fees on records that are relatively undeveloped when compared to the attention given to the merits of a case. *See Moore v. Jas. H. Matthews & Co.,* 682 F.2d 830, 839 (9th Cir. 1982); *National Association of Concerned Veterans v. Secretary of Defense,* 675 F.2d 1319, 1330 (D.C.Cir.1982). Nevertheless, we find the record here sufficient to permit meaningful review.

**15.** *See Reynolds Metals Co. v. Alperson,* 25 Cal.3d 124, 128–29, 599 P.2d 83, 85, 158 Cal. Rptr. 1, 3 (1979).

**16.** *See Golden West Insulation, Inc. v. Stardust Investment Corp.,* 47 Or.App. 493, 509–12, 615 P.2d 1048, 1057–58 (1980).

entitled to any expert witness fees over and above those provided for in 28 U.S.C. § 1821." The Covalts now contend that the court abused its discretion in modifying its original award in that it was unaware of its inherent equitable authority to award additional fees.

Although this court can freely overturn an exercise of discretion based on an erroneous conclusion of law, *see City of South Pasadena v. Goldschmidt,* 637 F.2d 677, 678 (9th Cir.1981), such action is inappropriate in this case. The Covalts did not demonstrate the exceptional circumstances that would have justified an exercise of the district court's "inherent equitable discretionary authority." Exercise of this authority usually requires a prior application to the court to incur the costs in issue. *See Cagle v. Cox,* 87 F.R.D. 467, 469, 471 (E.D. Va.1980). There was no prior application here. Nor can it be said that the surveys in question were essential to establish the defense. *See id.; Wade v. Mississippi Cooperative Extension Service,* 64 F.R.D. 102, 105 (N.D.Miss.1974); *see also Worley v. Massey-Ferguson, Inc.,* 79 F.R.D. 534, 541 (N.D. Miss.1978); *Welsch v. Likins,* 68 F.R.D. 589, 597 (D.Minn.1975), *aff'd per curiam,* 525 F.2d 987 (8th Cir.1975), involving disallowance of fees for expert witnesses under similar circumstances. The probative value of the surveys used in this case is debatable. Under these circumstances we hold that the trial court did not abuse its discretion in disallowing the additional costs.

### Conclusion

We affirm the directed verdicts for the Covalt defendants on the unfair competition and trademark infringement claims and for Dahl on the breach of the remodeling agreement claim. We reverse the directed verdict for the Covalt defendants and Pi Arn Squared on the breach of the remodeling agreement claim and remand with instructions that a directed verdict be entered in Shakey's favor. We affirm the attorney's fee and costs awards. Costs on appeal are awarded to the appellees under Fed.R.App.P. 39(a).

AFFIRMED in part; REVERSED in part; REMANDED.